DEPARTMENT OF REVENUE,
*Plaintiff,*

*v.*

GRANT WESTERN LUMBER CO.,
*Defendant.*

(TC 4394)

Trial was held April 24, 25, 26, 27, 28, May 1, 2, 3, 9, 11, 15, 18, 30, and June 2, 2000, in the courtroom of the Oregon Tax Court, Salem.

Marilyn J. Harbur and Joseph A. Laronge, Assistant Attorneys General, Department of Justice, Salem, argued the cause for Plaintiff (the department).

David L. Canary, Garvey, Schubert & Barer, Portland, argued the cause for Defendant (taxpayer).

Decision for Defendant rendered November 22, 2000.

**CARL N. BYERS, Judge.**

Plaintiff Department of Revenue (the department) appeals from a magistrate decision valuing an eastern Oregon sawmill for the 1996-97 and 1997-98 tax years. The appeal focuses on the use of whole plant sales and how to calculate functional obsolescence, issues with statewide implications. Consequently, both parties exerted extraordinary efforts and expended significant resources in support of their respective positions.

## FACTS

The subject property is a sawmill in John Day, Oregon. Originally constructed in 1974, it was designed to process large pine logs. The logs are taken from a cold deck or storage area, put on a conveyor and moved through a ring debarker that removes the bark. The debarked log is then placed on a carriage that moves the log through a stationary band mill. Slabs that are cut off the log are removed by chain transfers to edgers and trimmers that make more refined cuts to create boards of various shapes and lengths. Those boards then move onto a green chain (so named because the lumber is not yet dried) where workers pull the boards off the chain and place them into stacks according to size and grade. The boards are then "sticker stacked" and placed in a kiln for drying. After drying, they are planed, packaged, and shipped

to customers. Originally the mill mostly produced shop-grade boards for remanufacturing into pinewood products such as molding and furniture.

Defendant Grant Western Lumber Company (taxpayer) purchased the mill in 1992. Not long thereafter, taxpayer recognized that large logs were becoming scarce and the older technology of the mill was not efficient in processing smaller logs. Accordingly, taxpayer added a small-log side: a computerized "Optimil system" designed to maximize the recovery from smaller logs (18 inches or less in diameter). The additional equipment consisted of another ring debarker, a quad-head optimil, and a computerized edger. That addition resulted in the sawmill having two breakdown centers.

As of the assessment dates in question, the subject property was to be valued at its real market value for purposes of property tax assessment. *See* ORS 308.411.[1] However, the owner of an industrial plant may elect to preserve business confidentiality and keep plant income data from the taxing authorities. *See id.* If the owner makes that election, neither the taxpayer nor the taxing authorities may use the income approach in valuing the property. That leaves the appraisers with only the cost approach and the sales comparison approach.[2] The court will summarize the appraisal evidence before addressing specific issues.

*Summary of Appraisal Evidence*

The department's appraisers performed both a cost approach and a sales comparison approach. The department had previously appraised the mill in 1988 and in 1995. Its appraisers used those prior appraisals as a checklist while inspecting the property for their appraisals for this case. Their building and structure estimates are based primarily on cost data published by Marshall and Swift Valuation Service. Consequently, their cost approach for buildings and structures is replacement cost new (RPCN) less depreciation.

---

[1] All references to the Oregon Revised Statutes are to 1995.

[2] At one time, ORS 308.411 also prohibited either side from considering economic obsolescence or functional obsolescence in valuing the property. Those restrictions were lifted by 1995 legislation. *See* Or Laws 1995, ch 724, § 1.

The appraisers obtained both new and used costs for machinery and equipment. Because the cost approach requires an appraiser to estimate assemblage and equipment costs, they estimated freight, concrete footings, platforms, supports, installation labor (including power wiring, control wiring, etc.), engineering, and overhead. All of those costs were estimated new and then depreciated. In addition, the appraisers estimated functional obsolescence and economic obsolescence. The department's appraisers found a total reproduction cost new (RCN) for the mill of $18,445,201 and a depreciated reproduction cost (DRC) of $6,965,500.

The department's appraisers determined that 6 out of 17 sawmill sales east of the Cascades could be used in a direct sales comparison of whole mills. Based on their analysis, those sales gave an indicated range of $3 million to $7.5 million.[3] They estimated $4 million for the subject plant. However, they recognized that it is very difficult to compare sawmills so different in design. In addition, they concluded that sawmills do not usually sell unless the mill is in trouble and, therefore, there is no "active market" for sawmills. Consequently, in their reconciliation, the department's appraisers gave greater weight to the cost approach of $4,675,000 over the market approach of $4 million and concluded that the real market value of the subject property as of July 1, 1996, was $4,550,000.

Taxpayer's primary appraiser was Robert Yunker, a former employee of the Department of Revenue. Yunker was in a unique position because he appraised this same mill for the department for a July 1, 1995, assessment. As a senior industrial appraiser, his 1995 estimated value was used in assessing the mill for the 1995-96 tax year. In that appraisal, Yunker found a RCN of $13,086,100, a cost approach indication of $5,843,000, and a sales comparison approach indication of $4,625,000 with a reconciled opinion of value as of January 1, 1995, of $5,200,000.

---

[3] The evidence established that the department's "price" for the Gilchrist sale of $7.5 million is in error. The correct price was a little over $3 million. That greatly reduces the department's range.

In this appeal, Yunker found a reproduction cost used (RCU) of $5,581,000. After deducting functional obsolescence and economic obsolescence, he concluded that the real market value of the subject property was $2,215,000 by the cost approach.

In the sales comparison approach, Yunker used 28 comparable sales, 6 of which occurred before 1991 and 22 after 1991. The year 1991 was used as a benchmark because that was the year federal court decisions protecting the spotted owl drastically affected the amount of timber available from public lands.

Taxpayer's appraisers adjusted the comparable sales for differences in equipment, capacity, and other features in detailed calculations. Their first step was to break down the purchase price of whole mills by allocating portions to the various components, based upon the ratio of the RCN of the component to the mill's total RCN. That portion of the purchase price allocated to the component was then converted to a price per capacity of board feet for sawmill planing, dry kiln, boiler, and generator.

Using averaging and smoothing techniques, Yunker then determined percentage adjustments for planing, drying, co-gen, remanufacturing, and technology. He estimated the level of each sale relative to a standard or typical mill. He then adjusted each sale relative to the subject's position on that same scale. He also adjusted for location and conditions of sale. Based on all of those adjustments and calculations, he determined a range of price per capacity of board feet. That range was $11.08 to $21.59 per board foot of capacity.[4] From that, Yunker concluded that $18 per board foot of capacity was the most appropriate number for the subject mill. Using that number, he found an indicated value by the sales comparison approach of $1,800,000.

Larry Tapanen, another very experienced appraiser, conducted a market value to RCN ratio study (MV/RCN). Using 20 sawmill sales, he found that sawmills sell for

---

[4] The range of $11.08 to $21.59 is derived from four sales: Nos. 36, 38, 71, and 72.

between 3.45 percent to 18.25 percent of their RCN. Multiplying a RCN of $13 million for the subject plant by his estimated 12 percent ratio gave him an indicated value of $1,560,000 for the subject property.

Taxpayer's appraisers then reconciled the following numbers.

| | |
|---|---|
| RCN/MV Ratio | $1,560,000 |
| Cost Approach (Used Equipment) | $2,215,000 |
| Sales Comparison | $1,800,000 |

Based on those numbers, they concluded that the subject property had a real market value as of July 1, 1996, of $2 million.

## ANALYSIS

For the years in question, ORS 308.205 provided that real market value was the minimum amount in cash for which properties would exchange between willing buyers or sellers. The court has construed the statute to mean that property should be valued at the low end of the range. *See Cascade Steel Rolling Mills, Inc. v. Dept. of Rev.*, 13 OTR 252, 254 (1995).

Real market value is to be determined by methods and procedures that are in accordance with the department's rules. ORS 308.205. OAR 150-308.205-(D) (1995) indicates that a plant such as the subject sawmill is to be valued as an assembled unit, not by the market price of its component parts. The rule acknowledges that assembled value usually is greater, but it is possible that it may be less than the total of its parts. In addressing the sales comparison approach, OAR 150-308.205-(D)(2)(d) (1995) states:

"Properties utilized in the sales comparison approach, although not necessarily identical, at the very least, shall be similar in many respects. Adjustments shall be made for differences in location, product, production capacity, and all other factors which may affect value. Excessively large adjustments or an excessive number of adjustments is an indication that the properties are not comparable."

That rule highlights a major problem in valuing wood-product plants. Obtaining reliable, accurate sales data

that meets the high standards of the department's rules is very difficult. Ideally, the rules are designed to create as accurate an image as possible. By analogy, they demand a high-quality Carrara marble so a Michelangelo may create a lifelike David. However, reality is more like a fir log from which we must carve an upright grizzly bear with a chainsaw and ax. The tax laws do not allow for waiting until ideal conditions exist. A specific value must be determined so that the tax can be imposed. Therefore, the court must apply the tools given to the materials at hand.

*Sales Comparison Approach*

The department's appraiser used component replacement or reproduction cost to make adjustments for differences in sawmills. For example, if a comparable sale had no planing mill, the appraiser added the DRC of a planing mill to the sale price. The 1992 sale of the subject property for $2,840,000 was used as one of the comparable sales. The department added $1,988,500 as the DRC for the small-log side, resulting in a total indicated value of $4,828,500.

The addition of the small-log side to the mill should have increased its productive capacity to about 150,000 board feet. However, due to diminished log sizes and curved logs that take longer to process, taxpayer realized no significant increase in productive capacity. The prior operator of the mill reported actual production averaging 47,789,714 board feet per year from 1984 through 1990. By the court's calculations, taxpayer's records show the sawmill averaged only 45,344,333 board feet of production for the years 1994 through 1996.

In short, taxpayer added a small-log side, had a supply of timber, incurred overtime expenses, ran two shifts per day, and yet realized less production than the prior owner. Those facts would indicate that the additional investment did not significantly increase the mill's value. They also raise questions about the department's method. Adding the DRC of a component to a sale price to obtain an indicated value seems a poor use of sales data. Cost is not a good measure of value where there is significant economic and functional obsolescence, as is the case here. The RCN of the small-log

side was approximately $3,300,000, and it was installed as used equipment at a cost of $2,235,000. The department's estimated DRC of $1,988,500 represents 60 percent of its RCN and 89 percent of taxpayer's actual cost. Those levels are far above what the department has assigned the overall mill and far above any of the sales data.

As noted, Tapanen performed a MV/RCN ratio study. The court recognizes there are questions about the accuracy of the RCN figures used, the allocated sale prices, and comparability. However, Tapanen had appraised a large number of the comparable sales and was knowledgeable with regard to their RCN and sale prices. In the larger perspective, the MV/RCN study provides some meaningful parameters. The department's appraiser Taraleen Elliott agreed that if the RCN and the prices are correct, the ratio gives a good measure of overall depreciation.

Tapanen testified that in making the study he was trying to find some "level of trade." By finding that the lowest ratio was 3.45 percent and the highest ratio was 18 percent, he concluded that economic obsolescence is more in the range of 50 to 60 percent rather than the 30 percent the department has estimated.

Because of the wide range of ratios and the questions of accuracy and comparability, the court is unwilling to accept the ratio as a stand-alone method of estimating market value. Nevertheless, it is based on market data and provides a range of value. If another method indicates a much higher ratio, then some explanation or rationale is needed to support that higher ratio. For example, the department's estimate of real market value of $4.8 million represents 26 percent of its estimated RCN of $18 million. The evidence does not support such a high ratio.

The court finds that little weight can be given to Yunker's sales comparison analysis. Defendant's Exhibit J shows only one sale involved a generation component. There were also wide variations in the price per component. Dry kilns ranged in price from $.40 to $4.90 per board foot of capacity and from 1.81 percent to 24.5 percent of the purchase price. By estimating adjustment factors of 60 percent

for the sawmill, 20 percent for the planing, 10 percent for the dry kiln, and 10 percent for the boiler, the appraiser is smoothing very rough data.

Yunker used those numbers to adjust the comparable sales. For example, the technology of Gilchrist Timber (sale #1) was adjudged to be at the 25 percent level whereas the subject was estimated to be at the 30 percent level, resulting in a five percent adjustment to the Gilchrist sale. Adjustments for all the various categories were then netted to determine a single adjustment for the comparable to indicate a value for the subject.

There are many weaknesses with that method. It requires a large number of judgments using data with wide ranges, both in dollar terms and percentages. The primary basis for comparison is board feet of capacity or production, which the court concludes is not a reliable measure. While reason indicates board feet of capacity should be a good measure of comparison, the evidence indicates otherwise. As Robert Gloudemans testified, if board feet of capacity was an accurate basis for comparison, mills of the same capacity should sell for about the same price. They do not. The total range per board foot of capacity was from $4.10 to $36.13. When the adjusted prices have such a wide range, it suggests the averages are not very meaningful. In the court's view, it is a valiant effort to make sense out of very complex data. Although board feet of capacity must be one of the critical factors for buyers, the evidence does not persuade that it drives market prices.

Taxpayer introduced a statistical analysis of the comparable sales performed by Dr. Hal Heaton. That analysis was intended to answer two questions. First, is the price at which a sawmill sells significantly related to its board feet capacity? The analysis concluded that: Yes, capacity is a statistically significant determinant of price.

Using a least-squares regression analysis, Heaton found a very high probability that capacity affects price. However, the R2 indicates that capacity can explain only 22 percent of the variation in price. Gloudemans, the department's expert, testified that 22 percent is not enough for capacity to predict price. It leaves 78 percent of the variation

to be explained by other factors. Although board feet of capacity is important, so are the other variables. He pointed out that roughly half of the sales fall outside the $7.93 to $22.41 range. However, both Gloudemans and another department expert admitted that it is possible to use capacity to predict price if one includes the intercept. In this case, Heaton used a price per board foot of capacity of $15.17. When that is multiplied by 100,000 board feet of capacity, it results in $1,517,000. If Heaton's intercept of $695,280 is added, it gives a total indicated value of the subject property of $2,212,280.

The second question the analysis asks is: "Did the environmental issues involving the spotted owl in early 1991 significantly affect the sale price of lumber mills?" Again, Heaton found that there is an over 99 percent probability that environmental issues did affect sale prices and that sale prices went down from approximately $31.35 per board foot of capacity to $16.25 per board foot of capacity. Heaton applied two tests to verify that conclusion. The department submitted rebuttal testimony by a professor in applied statistics who noted that although there is a very significant relationship between the spotted owl and lumber mill prices, "correlation doesn't mean causation."

There is no quicker way to introduce confusion into the mind and error into the record than for the court to try and resolve methodological disputes between statistical experts. Fortunately, it is not necessary. The Heaton analysis shows a very strong relationship between capacity and price. However, that strong relationship or confidence interval is only with regard to that one variable. Using a best-point estimate for one variable to predict the price would be like trying to predict the price of a car based on mileage alone. Intuitively, one knows that there is a great difference in price between a 10-year-old car whose paint is faded and body is rusting and a car with the same mileage that is one year old with leather interior and a new-car smell.

The court believes that it would be error to conclude the slope coefficient establishes that the price for the subject mill would fall within a range of $7.93 to $22.41 per board foot of capacity. That inference would be true only with

regard to one variable. Other variables can move the price outside that range in either direction. Heaton's analysis itself states:

> "These data confirm that the value of a mill can be determined within a reasonable pricing range by adjusting for only a few variables. * * *.
>
> "* * * [a] handful of adjustments will lead to a fairly accurate estimate of the price at which a mill will sell. * * *."

Regression of one independent variable is not reflective of a "few" or "a handful" of variables that would explain 80 or 90 percent of the mill's price. It does not take an expert to know that some of those variables are age, condition, location, and other similar characteristics. Those important factors were not regressed or incorporated into the study.

Taxpayer contends that with capacity explaining 22 percent of the variation in price and the spotted owl explaining 15 percent of the variation of price, those two factors account for approximately 40 percent of the variance. However, the spotted owl ruling affected timber supply and timber supply affected productive capacity. To the extent that the spotted owl affected capacity, it is not simply additive.

■   In summary, the statistical conclusion that there is a significant relationship between price and capacity merely confirms one's intuition. The best-point estimate *plus* the intercept does constitute a sign post along the way, helping point us in the right direction to real market value. However, the court does not believe it is the destination marker.

## Cost Approach

The department appraisers apparently performed both a RCN and a RCU approach. They found a RCN of $18,445,201. The court is unable to find a summary that helps make sense of their many pages of field notes. In the absence of summaries or some explanatory notes, there is some concern about confusion. For example, the "tray sorter" mentioned in Plaintiff's Exhibit 16, installed in 1988, is a tray sorter in the planing mill. That tray sorter is not to be confused with the tray sorter that replaced the green chain

*after* the assessment date (mentioned in calculating functional obsolescence). Plaintiff's Exhibit 16 indicates that the DRC for the RCN approach was $6,965,500. The department's RCU approach arrived at a value of $6,922,400, which is remarkably close to the DRC. The department's appraiser then deducted $242,365 for functional obsolescence and 30 percent or $2,004,011 for economic obsolescence.

In comparison, Yunker found a RCU of $5,581,000. He deducted $2,416,000 for functional obsolescence and 30 percent or $950,000 for economic obsolescence, arriving at an indicated value of $2,215,000. Thus the two main differences between the parties in the cost approach is a difference of $1,384,500 in the initial DRC and a difference of $2,173,635 in the amount of functional obsolescence.

The difference in DRC is largely in the area of machinery and equipment. Taxpayer questions the department's number because, by the court's calculations, a 1988 department appraisal done by Roger K. Blomberg had a RCN of only $14,645,030 and a DRC without functional or economic obsolescence of $6,229,960. Using the 1988 appraisal notes, Yunker found a RCN of $13,086,100 for January 1, 1995. The court questions how Yunker could estimate a RCN of approximately $1.5 million dollars less than Blomberg when there is no evidence that any equipment was removed. To the contrary, over $3 million of equipment (RCN) had been added in the meantime. The court has spent a significant amount of time examining Yunker's field notes and has found some errors. It appears that Yunker failed to trend some cost figures and omitted some assets such as the bridge across the river. However, according to the court's calculations, his RCN is still only $14,194,037.

## Functional Obsolescence

The parties have a theoretical dispute with regard to the calculation of functional obsolescence. To avoid unnecessary confusion, the court will use the same terms utilized by the parties during the course of trial. Although the court will decide only the issues presented by the parties, some contextual discussion is necessary to understand the basis for the court's resolution of this issue.

■ "Functional obsolescence is caused by a flaw in the structure, materials, or design that diminishes the function, utility, and value of the improvement." Appraisal Institute, *The Appraisal of Real Estate,* 365 (11th ed 1999). Functional obsolescence exists only by comparison; there is no loss in value unless some alternative is better. Functional obsolescence is only deducted in the cost approach.[5] Therefore, any measure of functional obsolescence must be consistent with the theory and assumptions of the cost approach. The goal in calculating functional obsolescence is to reflect how the market would value the subject property using the cost approach.

There is a distinction between functional obsolescence due to excess capital costs and functional obsolescence due to excess operating costs.

> "The difference between reproduction and replacement cost represents the amount of excess capital cost. * * * Calculating operating obsolescence involves a comparison of the operating characteristics of the subject property to its modern equivalent." American Society of Appraisers, *Appraising Machinery and Equipment,* 98 (John Alico ed. 1989).

If flaws in the subject property impose higher operating costs than its modern equivalent, the market will pay less for the subject. However, the modern equivalent plant may require greater capital expenditures to achieve the lower operating costs. Therefore, the cost of the modern alternative must be considered when estimating functional obsolescence. When calculating functional obsolescence, the appraiser must stay true to the cost approach. *That means no property can be deducted from cost unless it has been first included in the cost.*

One of the first determinations that must be made is whether the flaw in the subject property is "curable." That is, could the owner obtain an increase in net present value by incurring the cost of correcting the flaw and thereby achieve lower operating costs? The parties agree that if the cost to cure is greater than the net present value of the loss (minus

---

[5] The direct sales comparison approach and the income approach to value inherently reflect all forms of obsolescence.

taxes), the flaw is considered "noncurable." If it is determined that the flaw is noncurable, the net present value of the loss (minus taxes) is used in calculating functional obsolescence. If the flaw is curable, the cost to cure is used in calculating functional obsolescence.

■ The parties also agree that there is a difference between functional obsolescence caused by a deficiency and functional obsolescence caused by a defect. A deficiency means the subject property is missing some machine or equipment (machine) and therefore incurs greater operating costs than a plant with that machine. A defect means that a machine in the subject plant is less efficient or more costly to operate than a machine performing an equivalent function in the modern plant. Those definitions are consistent with the terms *"deficiency requiring an addition"* and *"deficiency requiring substitution or modernization." See* Appraisal Institute at 388-89.

The concept of "cost to cure" is largely undisputed by the parties. It is the cost that would be incurred in changing the subject property to correct the flaw. If the subject property suffers from a deficiency, the cost to cure would be: (1) the cost of the missing machine, and (2) the cost of installing that machine. The parties agree that installing a machine in an existing property may be more expensive than installing the same machine when a plant is constructed new. To the extent the cost is greater, it is referred to as "excess" cost. If the subject property suffers from a defect, the cost to cure would be the total of: (1) the cost to remove the defective machine, (2) the remaining DRC of the defective machine[6] (less its salvage value), (3) the cost of the new machine, and (4) the cost of installing the new machine.

The dispute between the parties arises not so much from the concepts as from the calculations applying the concepts. That may be due to the fact that when calculating functional obsolescence, one is hypothesizing an addition in order to calculate a deduction. This mental gymnastic requires one

[6] The department does not agree that the remaining DRC of the defective machine is part of the cost to cure.

to consider market motives while staying true to the assumptions of the cost approach. Because cost is used as a surrogate for value, calculations of functional obsolescence must relate to the cost of the subject property.

Confusion may also arise from imprecise application of the concepts. It is important to understand that cost to cure is not the same as functional obsolescence. The distinction is important because curing the flaw results in a different property than the subject property whose value is being determined.

### Curable Deficiency

The parties agree that the amount of functional obsolescence due to a curable *deficiency* is "excess cost to cure." The market will penalize the subject property only to the extent of the excess or extra costs incurred in curing the problem. The market will not penalize the property for the cost of the missing machine because it was never in the reproduction cost. If it is a curable deficiency and there is no excess cost to cure, there is no functional obsolescence even though there are "excess" operating costs. That is because it is not the subject property that causes the excess operating costs, but the *absence* of some property. A mill that incurs excess labor costs because it is missing a machine that could do the job of ten workers may be deficient as an operating unit, but reproduction cost is still a good measure of the value of that existing mill. The mill's labor costs are only excess when compared to a plant that has the machine.

What must be remembered is that the machine can be obtained only at *additional* cost. Correcting the deficiency by adding the missing machine will add to the reproduction cost of the mill, not diminish it. Therefore, in a curable deficiency situation, only the excess cost to cure is deducted. Considered from the owner's point of view, the owner has the option of selling the plant "as is" (DRC less excess cost to cure) or incurring the cost of adding the machine and selling the plant for a *greater* amount. From a buyer's point of view, it can purchase the property "as is" and add a new machine or it can construct a new plant with that kind of machine in it.

As indicated, the parties agree that is the proper measure of functional obsolescence to deduct from reproduction cost in the case of a curable deficiency. That is consistent with the explanation set forth in the Appraisal Institute at 388:

> "Since the item is not present, the property cannot be penalized for any depreciation the item may have incurred. However, because it usually costs more to add an item to an existing property, the *excess cost to cure* is what the property is penalized for."

*Curable Defect*

The parties do not agree on the amount that should be deducted from the subject's reproduction cost where there is a curable *defect* in the subject. Taxpayer and its experts believe the full amount of the cost to cure should be deducted, including the cost of a new machine. In contrast, the department and its experts believe only the capital cost differential plus the excess cost to cure should be deducted. The court finds problems with both parties' calculations.

The court disagrees with taxpayer's position with some hesitancy. Taxpayer's expert, Dr. William M. Kinnard, Jr., has been an eminent authority in valuation methods for almost half a century. His explanations of why the value added by a cure should be ignored due to the risks of recovery were cogent and consistent. Nevertheless, as he acknowledged, the whole point of calculating functional obsolescence is to value what is there, not the property as cured. If the full cost to cure is not offset by the cost of the replacement item as if installed new, as provided for in the Appraisal Institute five-step method, the effect is to treat the property as cured. Because functional obsolescence measures the loss in value in the subject property, not the gain in value from curing the defect, the cost to cure must be offset by the cost of the replacement item as if installed new.

■ ■ The court rejects taxpayer's method of calculating functional obsolescence because not offsetting the cost of the new machine against the cost to cure undervalues the subject property. As indicated above, the parties agree that if there is a curable deficiency, the cost of the new machine should be

offset against the cost to cure. A defect condition can be made into a deficiency condition by deducting the DRC (less salvage value) of the defective machine from the reproduction cost of the subject property. By removing the DRC of the defective machine, the remaining reproduction cost of the plant is the same as if the defective machine had never been installed originally. If the machine had never been installed, the flaw would be a deficiency, not a defect. Because the parties agree that the cost of the new machine should be an offset in the case of a deficiency, logic requires the same treatment where the DRC of the defective machine is deducted as part of the cost to cure.

■    In evaluating whether to purchase the subject property, with its defective machine, or build an alternative with a good machine in it, the buyer will compare total costs. For example, assuming a curable defect, the buyer would weigh the *replacement cost* of the new machine in a new plant ($100) against the total of: (a) the DRC of the defective subject machine ($10) *plus* (b) the excess cost of installing a new machine in the subject property ($5) *plus* (c) the cost of the new machine ($100). Obviously, the buyer can choose to spend $100 for the machine in a new plant or $115 to purchase the defective subject machine and replace it with a new machine. Either expenditure will give the buyer a new machine. However, we are not valuing the subject property with a new machine in it (cured). We are using reproduction cost to measure the value of the subject property as it exists with its defect. In that "as is" condition, the market will penalize the subject property only $15 for functional obsolescence because that is the difference between the two alternatives. The additional cost of obtaining the new machine is not a penalty against the subject because the RCN of the subject does not include that cost. If an additional $100 is deducted from the RCN as a penalty for functional obsolescence, it undervalues the subject property.

The department's six-step method raises a number of questions on its face. From the point of practicality, for whole-plant comparisons, it requires the appraiser to do a complete replacement-cost approach and a complete reproduction-cost approach. Whether such expenditures of time and resources are justified is questionable. Also, although the formula may be mathematically pure, the facts of the real

world are rarely pure. This case is a good example. Due to the age and nature of the improvements, the department's own appraisers used a mixture of RCN, RPCN, and RCU to value the subject property. Neither the taxpayer nor the department has a pure RCN or pure RPCN estimate. Consequently, the exactness of analysis implied by the method can be illusory.

Even if theoretically correct, the department incorrectly applies its method of calculating functional obsolescence. In Plaintiff's Exhibit 34, another department appraiser, Robert DePuy, compares the Appraisal Institute five-step method with the department's six-step method in calculating functional obsolescence associated with the green chain. In the six-step method, he consistently used replacement cost used (RCU). However, in the five-step method, he employed RCU in the cost to cure but offset it with an "estimated" RPCN, resulting in a nonsensical negative number for functional obsolescence. If he had consistently used either RPCN or RCU in the five-step method, he would have derived a positive number for functional obsolescence. That would be true even if there was no excess cost to cure because there was $181,600 of DRC that would be included as part of the cost to cure.

Calculating a negative functional obsolescence number should immediately alert an appraiser that his or her calculation is in error. In Plaintiff's Exhibit 35, DePuy uses $45,900 as a cost to cure for a trimmer lug speed defect. However, his replacement cost if installed new is shown as $147,140. Again, mismatching costs or equipment produces a nonsensical number for functional obsolescence of a negative $68,705.

Based on the explanation of the trimmer lug speed defect in his appraisal report, DePuy did not have enough information to calculate functional obsolescence. The value of the loss is "unknown" and therefore it is unknown whether the flaw is curable. Also, the remaining depreciated cost of the existing lug loader is not shown. Therefore, he knew only part of the cost to cure and assumed the defect was curable.

The explanation in the appraisal report does show the cost of a conversion kit at $16,700. That would appear to be excess cost to cure since a new installation should not

require a conversion kit. If that is the case, the department's calculated functional obsolescence of $15,165 using the six-step method is less than the excess cost to cure alone. That is a clearly wrong result. The method set out in the Appraisal Institute, a widely accepted authoritative text, appears to accommodate all forms of functional obsolescence. That is the method the court will use in resolving the dispute in this case.

The parties agree that the subject mill's green chain incurs excess operating costs when compared with the use of a tray sorter. The net present value of those excess operating costs is $2,379,300. The DRC of the green chain is $181,600. The cost of a new tray sorter is $750,000, and the excess cost (removing the green chain and installing the tray sorter) is $40,000. Clearly, the defect is curable because the cost of curing the defect ($181,600 + $750,000 + $40,000 = $971,600) is less than the value of the loss ($2,389,300).

The amount of functional obsolescence deductible from the reproduction cost of the subject property is $181,600 + $40,000, or $221,600. The $750,000 is not deductible because it was never in the reproduction cost of the subject property. It would be inconsistent with the logic of the cost approach to deduct the cost of an item that was never included in the cost. That becomes apparent if the subject property has many defective machines. In such a case, if the cost of the new machines is deducted as an element of functional obsolescence, the total indicated value could be negative when in fact the subject property produces a positive net cash flow and therefore has value.

The department disputes specific items of functional obsolescence claimed by taxpayer. Those are:

(a)   inutility of the canter and board edger,

(b)   excess space in office and truck shop, and

(c)   the lack of a railhead.

Yunker deducted $1,116,000 for inutility of the optimil. That was done on the premise that the mill was designed to process between 3,000 to 5,000 logs (average 4,000) in an eight-hour shift when in fact the mill can process

only 800 to 1,200 logs per shift. Using an accepted formula, he calculated the functional obsolescence at 51.5 percent.

The court finds several problems with Yunker's deduction. First, the deduction for inutility assumes that taxpayer could incur less capital cost to obtain the same production. The evidence indicates that the cause of the underproduction is the nature of the logs, particularly curved logs. While there is some evidence that other less expensive technology could be used, it does not appear to be as efficient in either speed or recovery. Second, Yunker deducted functional obsolescence for the edger as well as the optimil. The evidence established that the problem is with the initial sawing of the log, not with the edger that processes the cants. If Yunker's logic was followed, all of the rest of the mill suffers functional obsolescence.

Yunker also found the office building was 25 percent larger and the truck shop was 50 percent larger than what taxpayer needed. Those estimates were based on his judgment as to what usual mills have. That testimony was too general and imprecise to justify those deductions. No specific evidence was introduced to show what portions of either of those facilities would not be used by other users. Neither building seems to be so unusually large that a significant percentage should be deemed functionally obsolete.

Yunker deducted $435,000 as functional obsolescence for lack of a railhead. That is based on estimating that absence of a railhead required 20 percent excess product handling. The court is not persuaded that lack of a railhead constitutes functional obsolescence. The test is whether the market, in considering the subject mill versus other mills, will discount the value of the subject because of lack of a railhead. As the department's witnesses point out, there are many considerations when considering the location of a mill. Based on the evidence submitted, the court is not persuaded the market would devalue the subject property $435,000.

In summary of the cost approach, it appears that Yunker's $13 million RCN is low. Because it is likely that the RCN is closer to $18 million than $13 million, the court concludes that the DRC should be closer to $6,965,500 than

$5,843,000. Deducting functional obsolescence of approximately $250,000, as estimated, the approach indicates a value of $6,715,500 before economic obsolescence.

Another measure of cost would be taxpayer's purchase price in 1992 for $2,840,000 (buildings, structures, and machinery and equipment), plus the cost of the small-log side that was $2,235,000, for a total of $5,075,000. Both of those measures have to be reduced by subsequent economic obsolescence. The department estimates economic obsolescence at 30 percent and the taxpayer estimates it at 50 to 60 percent. Using those figures, the upper range for the "traditional" cost approach would be $4,700,850 (30 percent x $6,715,500) or $3,552,500 (30 percent x $5,075,000) and the lower range would be $3,357,750 (50 percent x $6,715,500) or $2,537,500 (50 percent x $5,075,000).

*Reconciliation*

In trying to arrive at a determination of value, there are some facts that are clear. First, small logs make older technology less valuable. The evidence indicates that if taxpayer had not installed the small-log side, the mill would probably be closed today.

The spotted owl and screen 21 restrictions[7] affected market prices of mills. The effect of those government restrictions were well publicized and the impact was widespread. DePuy testified that many mills closed.

It is also clear that annual production of the subject mill did not increase despite the addition of the small-log side. As taxpayer's counsel pointed out, "What buyer would pay twice as much to obtain less production?"

Whatever may be said about the roughness and inconsistencies of comparable sales when viewed in board-feet capacity, it is clear that, overall, the ratio of market value to RCN is low. It is also clear that most of the competing mills such as Gilchrist Lumber, Blue Mountain, Crown Pacific/ Alebeni Falls, and Bonner's Ferry/Coeur D'Alene all fall in the 10 to 12 percent of RCN range. If Tapanen's 12 percent

---

[7] Screen 21 restrictions are timber-harvesting standards set by the federal government for protection of the spotted owl habitat.

ratio was applied to the department's $18 million RCN, it gives an indicated value of $2,160,000. Recognizing the newness of the small-log side added just before the assessment date, an appropriate ratio might be closer to 14 percent ($2,520,000) or 15 percent ($2,700,000).

Another perspective would be to multiply the older $14,645.030 RCN of Blomberg by 12 percent to indicate a value of $1,757,403 and then add something for the optimil or small-log side. The small-log side, which cost $2,235,000 in 1995, would have suffered both physical depreciation and functional and economic obsolescence by July 1, 1996. Because much of the optimal equipment was installed used and as an addition to an older mill, the court estimates that 50 percent should be deducted for functional and economic obsolescence. That leaves $1,117,500 which, when added to the $1,757.403, gives an indicated value for the subject property of $2,874,903. Finally, Heaton's statistical study with the value of the intercept indicates a value of $2,212,280.

In light of the above, the court believes the lower range of the traditional cost approach ($3,357,750 to $2,537,5000) is probably more reflective of real market value. As indicated, because the small-log side was added just prior to the assessment date, the court believes that the ratio of RCN to value should be higher than Tapanen's 12 percent. A ratio of 14 percent to 15 percent would indicate a value of $2,520,000 to $2,700,000. Recognizing the mill must be valued as a single-operating unit and at the "minimum" amount for which it would exchange hands in the marketplace, the court finds that the real market value of the subject property as of July 1, 1996, was $2,700,000, and as of July 1, 1997, was $2,500,000. Judgment will be entered in accordance with this determination. Costs to neither party.