IN THE OREGON TAX COURT
REGULAR DIVISION

NORPAC FOODS, INC.,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 4490)

David L. Canary, Garvey Schubert Barer, Portland, argued the cause for Plaintiff.

Joseph A. Laronge, Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant.

Decision rendered September 28, 2004. General Judgment of Stipulation filed February 3, 2005.

**HENRY C. BREITHAUPT, Judge.**

## I. INTRODUCTION

This matter is before the court on a request by the Defendant Department of Revenue (the department) for a preliminary ruling relating to the meaning of OAR 150-308.205-(D) (the Rule).[1] Plaintiff (taxpayer) has opposed the request for a preliminary ruling and has advanced its own view of how the Rule should be read.

The department's request for a preliminary ruling is grounded in its view that a statement of the court's interpretation of the Rule in advance of work by expert witnesses on

---

[1] All references to the Oregon Administrative Rules (OAR) are to the 2001 edition.

appraisal will give needed guidance to those experts. Taxpayer has argued that the court is not empowered to issue preliminary rulings except in cases where both parties join in the request.[2]

■     To the extent that taxpayer has grounded its objection on a view of the jurisdiction or power of the court to issue preliminary rulings, the exception that taxpayer appears to accept—rulings to which all parties consent—is inconsistent with that view. If the court has no jurisdiction or power to do an act, the consent of the parties cannot confer that jurisdiction.

Taxpayer does not suggest that the court could not ultimately rule on the meaning of the Rule, but only that it cannot or should not do so at this stage of the proceedings. It is clear to the court that the issues that have been briefed and argued will most likely have to be decided at some point.

Further, and more importantly, the parties have clear differences over how the Rule is to be read and what, if any, restrictions it places on appraisers who will testify as expert witnesses to assist the court. In order for the court to obtain the most helpful testimony from the expert witnesses, it is reasonable to clarify, in advance, the limiting conditions that apply. Expert testimony from appraisers is permitted to assist the trier of fact. OEC 702, ORS 40.410.[3] Appraisers must consider the law applicable to the location of the property being appraised. The court concludes that it would be inappropriate to leave appraisers in doubt as to the governing law they must consider when providing assistance to the court.

## II.   FACTUAL BACKGROUND

Although the factual record is not yet complete, the pleadings and submissions of the parties make reasonably clear, and the court will assume for purposes of its ruling,

---

[2] Both parties did join the request for a preliminary ruling in *Boise Cascade Corp. v. Dept. of Rev.*, 12 OTR 263 (1992) and *Hope Village, Inc. v. Dept. of Rev.*, 17 OTR 370 (2004).

[3] All references to the Oregon Evidence Code (OEC) and Oregon Revised Statutes (ORS) are to the 2001 edition, unless otherwise noted.

that the property in question is an integrated complex composed of land, a building, and affixed machinery and equipment (M&E). The complex functions as an operating vegetable-processing plant. Although such a plant was once a highly valuable asset operating in a thriving agricultural industry in Oregon, international competition in the vegetable industry and other factors have caused general economic stress in the industry and the value of the asset has declined. However, the asset remains in operation and is not subject to current efforts to liquidate its component parts.

## III.  ISSUE

As stated by the parties, the question for preliminary ruling is whether OAR 150-308.205-(D) prohibits the "highest and best use" (HBU) of the assets under appeal to be other than their continued use as an integrated and operating vegetable-processing complex, such as an HBU based on the premise of removal where the M&E are liquidated and the building has an alternate use.

## IV.  ANALYSIS

A number of observations are important at the outset:

1.   This ruling does not direct what appraisal professionals must do but what they may do.

2.   In the statement of the issue, the phrase "such as an HBU based on the premise of removal . . ." is one, but only one, alternative use that might be considered if the Rule does not dictate consideration of only one HBU.

3.   Whether an HBU conclusion in an appraisal is credible and convincing to the court will depend on the evidentiary support for that conclusion. A "possible" HBU is just that—it is not necessarily more probable than any other possible HBU.

## A. *The Legal Context of Valuation*

As a result of a citizen initiative[4] and one referendum[5] the system of property taxation in Oregon has become highly "constitutionalized." For decades the property tax system was a statutory ad valorem or value based system subject only to constitutional requirements as to uniformity.[6] Now the base for taxation may or may not be the value of property and there is no uniformity clause restriction.[7] Although real market value (RMV) has lost its conclusive role in the property tax process, it remains an important component and now, by constitution, is defined. Article XI, section 11 (11)(a)(A) provides that in applying the constitutional provisions of Measure 5 and Measure 50:

> "The real market value of property shall be the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year, as established by law."

The constitutional definition is familiar as the classic definition of fair market value. RMV plays a role in setting the starting point for determining the maximum assessed value (MAV) calculation.[8] In addition, the assessed value (AV) for property must always be, for properties of the type in question here, the lesser of the MAV or the RMV for the property.[9]

---

[4] An initiative petition filed May 8, 1990, and adopted by the people November 6, 1990, created sections 11b, 11c, 11d, and 11e, of Article XI, of the Oregon Constitution (Measure 5).

[5] House Joint Resolution 85 (1997), adopted by the people May 20, 1997, created section 11 and repealed sections 11a, 11f, 11g, 11h, 11i, and 11j, of Article XI, of the Oregon Constitution (Measure 50).

[6] Or Const, Art I, § 32; Or Const, Art IX, § 1.

[7] Or Const, Art XI, § 11(18). *See generally* Measure 50.

[8] Under the Measure 50 regime, the starting point of the MAV of property in existence in 1995 begins by taking the RMV of that property minus 10 percent. The starting point of the property added later than 1995 begins with a determination of the RMV of similar property and the ratio of that RMV to MAV. Or Const, Art XI, § 11.

[9] Or Const, Art XI, § 11, as implemented in ORS 308.146(2).

The property tax obligation for the subject property in this case, therefore, cannot be calculated without reference to RMV—as defined in the constitution and the statutory enactments that implement the constitutional provisions. The legislature has defined RMV in pertinent part as:

"(1)   Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year.

"(2)   Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue and in accordance with the following:

"(a)   The amount a typical seller would accept or the amount a typical buyer would offer that could reasonably be expected by a seller of property."

ORS 308.205. No party has suggested that any of those statutory provisions are unconstitutional.

■       Pursuant to ORS 308.205(2), the department has promulgated the Rule. In doing so, it can in some way be seen as responding, at least in part, to a plea from the Oregon Supreme Court to exercise its rulemaking authority under the statute. In a series of cases the Supreme Court noted that, absent adoption of rules that could serve as a standard for a legal analysis and review, the process of valuation was one of determining facts.[10] The then prevailing statutes on Supreme Court review of decisions of this court required that the Supreme Court make its own *de novo* determination of facts, and, therefore, value findings, based on the record created in this court.[11]

---

[10] *See Bylund v. Dept. of Rev.*, 292 Or 582, 641 P2d 577 (1982). *See also United Telephone Co. v. Dept. of Rev.*, 307 Or 428, 770 P2d 43 (1989); *Ernst Brothers Corp. v. Dept. of Rev.*, 320 Or 294, 882 P2d 591 (1994).

[11] ORS 305.440 (1993). Following an amendment in 1995, ORS 305.440 changed the standard of review of factual questions by the Oregon Supreme Court. The 1995 amendment did not provide any change in how this court is to apply department rules adopted under ORS 308.205.

In discussing what role rules could have, the Supreme Court never suggested that any rule adopted would be, *ipso facto*, valid.[12] Nor did that court suggest that any rule adopted would necessarily displace any factfinding function by a court in areas not addressed by the rule.[13] Nor did the court indicate that the language of a rule might not need to be construed.

Accordingly, in analyzing the Rule at issue here, the court must keep in mind several points:

1. In property tax matters, there has been a consistent and continuous focus in the Oregon statutes and constitution on a concept of value that is essentially fair market value.

2. The people and the legislature have acted against a clear background of decisions in which fair market value has been determined by reference to basic appraisal theory and practice—the goal of which is to estimate or approximate what an actual sale of a property would yield if such a sale occurred in a fair market.

3. Department rules, if consistent with the statutory and constitutional focus on RMV elements will, so far as they go, define the methodology for appraisal.[14]

4. The ultimate goal of all rules, procedures, and practices must be to arrive at an estimate of fair market value.

5. Under *Delta Air Lines, Inc. v. Dept. of Rev.*, 328 Or 596, 984 P2d 836 (1999), valid department rules supplant independent judicial creation of appraisal standards.

---

[12] Indeed, in *Delta Air Lines, Inc. v. Dept. of Rev.*, a case on which taxpayer relies, the court applied a rule that spoke directly to the point in question and noted that there was no challenge to the validity of the rule. 328 Or 596, 610 n 8, 984 P2d 836 (1999).

[13] In *Delta Air Lines*, a department rule specifically addressed the point in question. *Id.* at 609. Here the Rule does not address HBU specifically. Taxpayer urges that what it sees as inferences from the Rule should be enforced in the same manner as a specific provision was enforced or applied in *Delta Air Lines*.

[14] It is possible to imagine that a court could determine, based on expert testimony or other factors, that a department rule was not valid.

6. No party in this case disputes that the Rule governs in this case. The dispute is what is said in the Rule.[15]

## B. *Does the Rule Contemplate or Prohibit Use of HBU Concept?*

The department takes the position that the Rule does not prohibit a conclusion by an appraiser or the court that the HBU of the assets under appeal is other than their continued use as an operating integrated vegetable food processing plant. The department observes that the Rule contains no prohibition on the traditional role for the concept of HBU and does not present a limiting condition for the appraiser or a legal limit on this court.

Taxpayer, however, looks at the Rule, especially its provisions on the definition of "unit of property," and concludes that such definition implicitly places a severe restriction on any traditional HBU analysis. In taxpayer's view, the Rule requires appraisal of the property based on its current use or only those alternative uses that involve minimal alteration to the property. Taxpayer points to four particular provisions of the Rule to support its position:

1. The definition of the unit of property to be valued;

2. The provision that the real market values of an operating plant shall be a going concern;

3. The provision that value is not to be determined by aggregation of component prices; and

4. The provision that liquidation or scrap sales of components are not to be used in applying the sales indicator of value unless the property has been or is subject to liquidation sale.

---

[15] Taxpayer argues that a ruling on the meaning of the Rule by this court in this context violates the Administrative Procedures Act (APA). The APA provides a general statement on testing the validity of agency rules. *See* ORS 183.400. It does not limit this court in construing the meaning or validity of rules in the context of litigation where the rule is involved. Over such matters, this court has exclusive jurisdiction. ORS 305.410. Nor does the APA prevent the department from asserting, in an argument about the construction of a rule, that some interpretations it opposes would render a rule invalid.

1. *Definition of Unit to be Valued*

Taxpayer points out that the Rule provides that the unit to be valued is "the item, structure, plant or integrated complex as it physically exists on the assessment date." OAR 150-308.205-(D)(1)(a). Taxpayer concludes that embedded or implicit in this provision is the notion that in valuing the unit, the appraiser may not consider uses other than the use of the plant substantially as it exists on the assessment date. In the court's view, taxpayer's interpretation converts a statement of *what* is to be valued, the plant or complex, into a limitation on *how* it is to be valued—only by reference to existing use. The court does not accept that reading of the Rule.

■ It is quite possible to follow the direction of the Rule and value a unit or integrated complex as a whole without excluding consideration of other uses for the entire group of assets that compose that unit. One must start the analysis with the unit as it exists on the assessment date, but nothing in the Rule requires one to end the analysis there. An appraiser or factfinder could conclude that market participants would bid the most for the unit only with the expectation of immediately altering the unit. If that were the conclusion, consideration of the unit as it exists on the assessment date is still important because that configuration defines many things, including what alteration costs may have to be faced by market participants contemplating other uses.

2. *Real Market Value—Going Concern*

The Rule provides, in part:

"When the unit of property is an operating plant or an operating integrated complex, the real market value shall be considered to be a 'going concern.' The going concern concept recognizes that the value of an assembled and operational group of assets usually exceeds the value of an identical group of assets that are separate or not operational."

OAR 150-308.205-(D)(1)(b). Before the preliminary ruling of this court in *Boise Cascade Corp. v. Dept. of Rev.*, 12 OTR 263 (1992), the Rule read, in part:

"When the unit of property is an operating plant or an operating integrated complex, it shall be considered to be a

'going concern.' The going concern concept recognizes that the value of an assembled and operating group of assets usually exceeds the value of an identical group of assets that are separate or sitting idle."

OAR 150-308.205-(D)(1)(c) (1989) (OAR 150-308.205-(D)(1)(b) as it read from December 31, 1989 to December 31, 1991).

Taxpayer argues that the language of the Rule relating to "going concern" means that the appraiser or factfinder must value the assets as used on the assessment date, only those assets and only in the configuration in which the historic owner had the assets arranged and "going" on the assessment date. That view converts the language of the Rule into a severe restriction on HBU analysis. It is, essentially, another articulation of the view that the Rule goes beyond stating *what* is valued and imposes tight limits on *how* assets are valued.

■     This court's opinion or ruling in *Boise Cascade*, which taxpayer says was the impetus for the changes that led to the current language in the Rule, did not in fact address HBU at all. Instead this court's ruling was devoted to sorting out which elements of an operating plant would be taxable real property and which elements would be nontaxed intangible personal property.[16] As this court pointed out, the unit of property is to be considered in light of the assemblage that has, in fact, occurred. That assemblage, which is reflected in the physical assets themselves, and the relation they bear to each other, often has a value enhancing effect. That effect reflects the cost of assemblage and the risk reduction feature that successful assemblage adds. However, as this court pointed out, the assemblage effect is not presumptively or necessarily positive. The value of an asset composed of assembled components may be less than what the sum of the value of unassembled components would be. In construction, mistakes have been made. Taxpayer seizes on the language of the Rule on the relation of assembled and unassembled values and insists that where the assembled value is lower that value must be the final value assigned to the property,

---

[16] Except for certain centrally assessed properties, intangible personal property is not subject to taxation in Oregon. ORS 307.030(2).

without regard to consideration of alternative uses to which the asset group might be put.

■        Although the Rule as interpreted by *Boise Cascade* gives one observation on how to value a plant, by valuing assembled assets so as to capture the positive or negative effect of assemblage recognizing that those two values may not be the same, the Rule does not purport to thereby exclude any consideration of alternative uses or values for the assembled assets. It does not exclude consideration of whether another configuration of the assets would yield a higher value. And, although taxpayers in general do not like this, the valuation process in property tax matters looks for the highest value that can be placed on an asset or group of assets, regardless of the fact that the component value or current aggregated value might be less.[17] That highest value is obtained only after consideration of all potential uses for the assets and determining which use produces the highest value.

The elimination of HBU analysis and valuation solely by reference to a particular use is done, as noted above, where a statutory special assessment regime is created. Such regimes have been created, for example, for farmland and timberland.[18] Taxpayer's position, in essence, is that the Rule creates such a special assessment regime for industrial properties that are the subject of the Rule. Two problems exist as to that position.

First, the language of the Rule is paralleled by language for department rules on property generally. OAR 150-308.205-(A). A reading of the Rule as taxpayer proposes would mean that HBU analysis would have virtually no place in the valuation process in Oregon. Nothing in the Rule, the parallel rule for property generally, or cases that have been

---

[17] It is that feature of valuation that made necessary special assessed value statutes for farmland and buildings. The assembled value of farm assets might well be higher or lower than the aggregate component values, but the market reality was often that the value for development was higher than the highest of assembled or disassembled farm components. Only special statutory provisions prevent farm assets from being valued at the development value that factual evidence would show.

[18] ORS 308A.050 to 308A.128 and ORS chapter 321, respectively.

decided over the years suggest that such a profound effect was intended or accomplished.

Second, although a powerful statement in light of *Delta Air Lines* and other cases, the Rule was not promulgated without a limiting context. The Rule is a product of department action under ORS 308.205. That statute, however, only permits rules to be adopted that are in accordance with certain principles, one of which is recognizable as essentially the fair market value principle: "The amount a typical seller would accept or the amount a typical buyer would offer that could reasonably be expected by a seller of property." ORS 308.205(2)(a).

■ The fair market value principle includes a consideration of HBU. *See STC Submarine, Inc. v. Dept. of Rev.,* 320 Or 589, 890 P2d 1370 (1995). *See also Sabin v. Dept. of Rev.,* 270 Or 422, 528 P2d 69 (1974). Accordingly, to read the Rule as essentially eliminating consideration of HBU would be to read the Rule as a radical departure from the classic fair market value principle. That construction would raise questions as to whether the Rule was consistent with ORS 308.205 and, indeed, the Oregon Constitution provisions on real market value. Such a construction of the Rule is to be avoided if possible.

Here it is quite possible to construe and apply the Rule without reading the HBU principle out of the valuation process. One can respect the unit of property concept and the going concern concept, as interpreted in *Boise Cascade*, without concluding that HBU is to be ignored. Indeed for the HBU concept to be applied, one must answer the question: "highest and best use of what?" The "what" is the unit considered in its assembled state. That assemblage has an inertia-like feature that will mean that often the existing use is the HBU, because the costs of overcoming the inertia of the assembled unit, by alteration or otherwise, will preclude market participants from bidding a value for the unit that is higher than that produced by its current use.

■ However, there are occasions, for example when fundamental macro-economic shifts occur, where existing uses are rendered so obsolete that competing uses for the unit, which may involve alteration of the unit, yield higher values.

Taxpayer has urged that the department's reading of the Rule is an attempt, or part of an attempt, to avoid recognizing the consequences of economic or external obsolescence. In fact, the foregoing analysis gives great attention to economic obsolescence. However, the consequence is not, as taxpayer would have it, a simple conclusion that a plant is obsolete in absolute terms. The HBU concept requires a comparative or relative approach, not one absolute valuation of a plant.[19] The HBU principle requires that the value of the plant, after consideration of all obsolescence, be compared with its value to alternative uses. One of those alternative uses may, as obsolescence of current use increases, become a higher and better use for the asset group, or some part of it. Ironically for taxpayer, the greater the obsolescence and the more attention that it is given, the more likely it will be that the inertial value of current use will be overcome and an alternative use will be found to be highest and best. It is that dynamic that, in the actual market place, has converted gas stations into food or coffee stands and aged grocery stores into banks or churches.

### 3. *Market Value is Not an Aggregate of Component Prices*

■    The Rule provides, in part:

> "The market value of a unit of property shall not be determined from the market price of its component parts, such as wood, glass, concrete, furnaces, elevators, machines, conveyors, etc., each price separately as an item of property, without regard to its being integrated into the total unit."

OAR 150-308.205-(D)(2)(b). From that language taxpayer concludes that any consideration of alternative uses that involves disposal of some components cannot be valid because it would necessarily involve a component analysis. But the Rule does not say that an HBU analysis that credits proceeds from some disposal of components, as a feature of alteration, is prohibited. Indeed it does not look at disposal of components at all, but only at a prohibition against arriving

---

[19] The concept is highest use, not high and good use. "Highest" and "best" are words of comparison, not absolute statements.

at full value by aggregating the costs or values of all components of a unit of property. That function is really nothing more than recognizing that, as this court did in *Boise Cascade*, assemblage may have an effect on value (positive or negative). The Rule in that regard does not set aside standard HBU analysis but only prohibits an appraiser who has arrived at an HBU of current use from then valuing that use by simply aggregating component values.[20] For better or for worse, assemblage must be considered as part of a full analysis, including HBU.

### 4. *Limitation on Use of Liquidation or Scrap Sales*

The Rule provides, in part:

> "Sales for the disposal of properties through auction, liquidation or scrap sales are indicators of market value only when on the assessment date such disposal of the subject property is imminent, or has actually taken place."

OAR 150-308.205-(D)(2)(f). As with the discussion of the preceding section of the Rule on which taxpayer relies, it is important to note that that language does not proscribe use of the HBU principle. Like other provisions, and the ruling in *Boise Cascade,* it requires consideration of the assembled value of the plant, but it does not dictate that the assembled value is the highest. Nor does it preclude consideration of other uses that might involve alteration of the assembled assets or disposal of certain assets in the plant on the assessment date. What the language does is to limit the instances in which liquidation sales can be considered. Liquidation is obviously an extreme statement as to value of any use. Although it does occur, the Rule can be properly read as saying that such extreme evidence should be considered definitive only when the extreme evidence is actual and not hypothetical.

What the Rule speaks to in that regard is also a liquidation of an entire property and not some component. If a higher and better use dictates disposition of some machinery, for example, that language does not prevent consideration of that event and the proceeds that might be obtained.[21]

---

[20] Such aggregation of component values would also be prohibited in the tentative valuation of other uses that are part of the HBU analysis.

[21] Taxpayer has insisted throughout that any contemplated use that would involve hypothetical disposal cannot be considered because it would not value all

## C. *Effect of Case Law*

Taxpayer insists that case law precludes the foregoing analysis and requires a construction of the Rule that imposes tight restrictions on the HBU analysis. For support of that argument, taxpayer points to the decisions in *Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 801 P2d 809 (1990) (*Freedom Federal*) and *STC Submarine*. However, those decisions in fact demonstrate that the HBU principle is one of the foundations of appraisal of market value and must be considered in an appraisal of market value.

In *Freedom Federal*, the court did not eliminate or severely limit the HBU principle. Instead it applied that principle but concluded that the existing use was the HBU. 310 Or at 726. The court did not indicate that existing use had any status other than one of many uses that could be considered. The court considered the competing uses proposed by the parties[22] and concluded that the current use was the HBU. *Id.* Taxpayer focuses on language in which the court, explaining its agreement with the department proposal, observed that "[t]he building was specifically designed and was used for that purpose [financial headquarters]." *Id.* Taxpayer also focused on these words of the court: "Whether the highest and best use would continue to be a financial institution's headquarters *after* the assessment dates is irrelevant." *Id.* (emphasis in original).

Two observations are important. First, taxpayer desires to convert the last quoted language from the opinion into some presumption that HBU is the current use or, stated differently, that the probable future uses are irrelevant. But that is not what the court said. Instead, the court directed the focus to be on the assessment date and the court specifically

---

assets in place on the assessment date. The Rule says to consider or account for all assets but does not say how. Crediting value for components disposed of takes the components into account. It does so, however, without being strapped to the view that the assets must be considered in exactly or substantially the same configuration they happen to be on the assessment date. The Rule requires consideration of all assets in place but not necessarily in any given place. If assets have been assembled, changing that assemblage triggers a cost associated with alteration, to which disposal proceeds are credited. And some placements of assets will be such that the evidence will show alteration of the unit will not be economically rational.

[22] The department proposed existing use as a headquarters building for a financial institution and the taxpayer proposed multi-tenant office use.

considered other possible uses *on that date*. *Id.* The proof of that is the court's observation, in the same section of the opinion, that the building "contained extensive open space and expensive amenities, making it difficult to adapt for multi-tenant use." *Id.* Indeed that language shows that courts may consider alternate uses that involve adaptation as long as they also consider the costs of adaptation. Second, the court's analysis shows that consideration of alternate uses does not mean adoption of alternate uses. The use that yields the highest value will be adopted. As the court noted in *Freedom Federal*, the taxpayer's own appraiser had done comparative valuations on the two proposed uses and found that existing use was more valuable. *Id.* at 727. It was so, not because it was existing, but because it was more valuable—it was "highest and best."

*STC Submarine* involved a taxpayer arguing that where no current market for the subject property existed, its HBU could not be its current use. 320 Or at 592. That argument was rejected when the Oregon Supreme Court adopted this court's statement that "[t]he highest and best use of a special purpose property as improved is probably the continuation of its current use, if that use remains viable." *Id.* at 593 (citing *STC Submarine, Inc. v . Dept. of Rev.*, 13 OTR 14, 19 (1994) (internal quotations and citation omitted)).

This court in *STC Submarine* reached its conclusion, which was affirmed by the Oregon Supreme Court, by considering current use and alternative uses and choosing as the HBU the use that produced the highest value.[23] Taxpayer here in essence argues that process cannot occur, regardless of the outcome of the analysis, given the provisions of the Rule. Taxpayer urges the court to read the Rule as forcing the appraiser to consider only the current use or a slight modification. *STC Submarine* does not require that.[24]

---

[23] *STC Submarine* involved "especial property." *See* OAR 150-308.205(A)(3). Neither party suggests that the property in this case is especial property but, in the court's view, observations about especial property are even more relevant to other property.

[24] Indeed, the analysis in this court and the Oregon Supreme Court in *STC Submarine* indicates that current use might not be HBU where there is no viable market for the products of a plant, so that the current use is no longer viable. That may be the situation here, although only factual presentations will tell. The Rule does not preclude the consideration of that question, nor does it dictate any particular answer to the question. This court's statement that a current use will

■      Neither *Freedom Federal* nor *STC Submarine* support a conclusion that the Rule proscribes traditional HBU analysis. Quite to the contrary, each decision adopts the traditional principles in contexts where, as here, the parties disputed the outcome of the application of the principle. The fact that in each decision the then current use was found to be the HBU does not support a conclusion that current use is the preferred conclusion. It only supports the conclusion that, on the facts of those cases, the current use produced the highest value.

## V.  CONCLUSION

A consideration of the text and context of the Rule, as well as case law, leads to the conclusion that the Rule allows the HBU of assets under appeal to be other than their continued use as an integrated, operating, vegetable-processing complex.

---

"probably" be the highest and best use, obviously admits the possibility that it will not be.