IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| LARRY MANUEL, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 170330N |
| | ) | |
| v. | ) | |
| | ) | |
| CROOK COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

This is one of ten cases considering the value of omitted personal property used in rental cabins at the Brasada Ranch resort.[2] The years at issue are as set forth in the facts below. Trial in all ten cases was held concurrently. Plaintiffs in all ten cases (taxpayers) were represented by Carlyle MacHarg III and Charles Pratt, both of whom appeared and testified at trial. In addition, Ramona Hulick, auctioneer, testified for taxpayers. Eric Blaine, Assistant County Counsel, appeared on behalf of Defendant (the county). Shaun Christofferson, Chief Appraiser, and Karen Bushnell, Assessment Technician III, testified for the county. Plaintiffs' Exhibits 1 to 10 and Defendant's Exhibits A to M were admitted without objection.

## I.  STATEMENT OF FACTS

Brasada Ranch is a luxury resort in Central Oregon with amenities that include a designer golf course and a 17,000-square-foot recreation center. The personal property tax accounts at issue in these cases hold the furnishings of individually owned rental cabins at the resort; *e.g.*,

---

[1] This Final Decision incorporates without change the court's Decision, entered April 26, 2018. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] The ten cases are: *Storey v. Crook County Assessor*, TC–MD 170316G; *Serendipity Associates LLC v. Crook County Assessor*, TC–MD 170318R; *McElroy v. Crook County Assessor*, TC–MD 170322G; *Wilsey-Magers v. Crook County Assessor*, TC–MD 170324R; *UYB Ranch LLC v. Crook County Assessor*, TC–MD 170327N; *Spann Family 2007 Rev Trust v. Crook County Assessor*, TC–MD 170329G; *Manuel v. Crook County Assessor*, TC–MD 170330N; *Paul Nielsen Family LP v. Crook County Assessor*, TC–MD 170331R; *Nielsen v. Crook County Assessor*, TC–MD 170332R; and *Vandermolen v. Crook County Assessor*, TC–MD 170340R.

furniture, appliances, and household and kitchen items. The cabins were built between 2005 and 2007 with similar two- and three-bedroom floorplans, varying slightly in number of bathrooms and number of floors. (Ex 1.) All cabins were sold identically furnished, with the three-bedroom cabins having additional furnishings of the same type. During the years at issue, virtually all furnishings in the subject accounts were original and generally similar in the amount of wear and tear.

In July 2017, the county added the cabin furnishings to the tax roll as omitted property for years dating back to 2011. The county set the assessed value of the furnishings at the full amount of the real market value it concluded. (Ex 2 at 3.) The personal property real market values added to the accounts are summarized in the following table. Where no value is listed in a column, that year is not at issue for the given account.

| Case Number | Account Number | 2BR/ 3BR | 2011–12 RMV | 2012–13 RMV | 2013–14 RMV | 2014–15 RMV | 2015–16 RMV | 2016–17 RMV |
|---|---|---|---|---|---|---|---|---|
| 170316G | 66042 | 2BR | $24,801 | $22,321 | $20,088 | $18,080 | | |
| 170318R | 66052 | 3BR | $31,178 | $28,060 | $25,254 | $22,729 | $20,456 | $18,410 |
| 170322G | 66058 | 2BR | $24,801 | $22,321 | $20,088 | $18,080 | | |
| 170324R | 66105 | 2BR | $25,982 | $23,383 | $21,045 | $18,941 | $17,047 | |
| 170327N | 66081 | 2BR | | | | $18,080 | | |
| 170329G | 66076 | 3BR | $31,178 | $28,060 | $25,254 | $22,729 | $20,456 | $18,410 |
| 170330N | 66084 | 2BR | $24,801 | $22,321 | $20,088 | $18,080 | | |
| 170331R | 66064 | 2BR | $24,801 | $22,321 | $20,088 | $18,080 | | |
| 170332R | 66063 | 2BR | $24,801 | $22,321 | $20,088 | $18,080 | | |
| 170340R | 66080 | 2BR | $29,196 | $26,277 | $23,649 | $21,284 | $19,156 | $17,240 |

By the parties' agreement, the 2017–18 tax year is also at issue in two cases, *Serendipity Associates LLC v. Crook County Assessor*, TC–MD 170318R, and *Spann Family 2007 Rev Trust v. Crook County Assessor*, TC–MD 170329G.

A.      *Cost Methods*

Although the county generated the tax roll values using the cost approach applied to each component of the subject accounts, only the taxpayers submitted written evidence of the county's

approach. (Ex 5 at 7–9.) Taxpayers presented their own cost approach as well, also valuing the components separately but using a different original value and applying a different depreciation schedule.

1.    *Original value*

Christofferson testified that, in 2006, the previous owner of Brasada Ranch reported to the county that the personal property cost $67,000 for a two-bedroom cabin and $77,000 for a three-bedroom cabin. The county assessor directed his staff to use $42,000 as an initial 2006 value for the personal property of a two-bedroom cabin and to derive roll values for later years from that figure.[3,4]

Taxpayers questioned the original value contained in the county records and submitted an estimate of original cost prepared by a procurement professional who did not testify. The taxpayers' expert's estimated original cost was $40,355 for furnishings of a three-bedroom cabin. (Ex 6 at 6.) In addition, taxpayers provided evidence that some personal property had been removed from the cabins in 2012. (Ex 6 at 3.)

2.    *Depreciation*

The county determined the roll values by reducing the total value of each personal property account by 10 percent each year. (Ex 5 at 2.) That method of determining value differed from—and was less favorable to taxpayers than—the guidelines published by the Department of Revenue, which would have reduced the subject property's value by 17 percent the first year and by somewhat less for the successive years. (*See id*. at 5.) When asked to

---

[3] No testimony was heard as to the original value used for a three-bedroom cabin. Extrapolating backward from the data, it appears that the county used a 2006 value of $52,800.

[4] The county submitted evidence after trial that information provided to the assessor by the previous owner matched the directions given by the assessor to his staff, contradicting Christofferson's testimony. That evidence was not admitted and is not considered in this decision.

explain the reason for the difference, Christofferson testified that the county had been valuing personal property with a straight 10-percent reduction for as long as he had been there, and that other counties did similarly.

Instead of the straight 10-percent per year, taxpayers applied the Department of Revenue's cost factors to each component item of the accounts. Beginning with the lower original value, eliminating some items not in the accounts, and applying the more favorable cost factors resulted in estimates of 2012 personal property value of $17,087 for a three-bedroom cabin and $14,111 for a two-bedroom cabin. (Ex 6 at 9, 29.) Tables of reduced amounts for subsequent years were also provided.

B.      *Sales Comparison*

Taxpayers identified a comparable sale of a three-bedroom cabin's complete furnishings for $14,000 in 2010, although they had not verified it. (Ex 10.) Christofferson testified that after receiving taxpayers' exhibits he had spoken with the buyer and confirmed the sale for $14,000 had occurred as reported. The buyer had purchased an unfurnished three-bedroom cabin from a bank and purchased the furnishings from another cabin owner whose cabin was undergoing foreclosure. The furnishings were not listed on the market.

Christofferson provided a chart comparing the 2009 sale prices of two unfurnished cabins—$352,000 for three bedrooms and $275,000 for two bedrooms—with the sale prices of furnished cabins that year. (Ex E.) Christopherson provided two three-bedroom comparables and two two-bedroom comparables. He adjusted the comparables for date of sale and for "Lot/Location view." After adjustments, the difference between the sale price of a three-bedroom cabin furnished and unfurnished ranged from $59,400 to $136,190. The difference for

/ / /

a two-bedroom cabin ranged from $111,100 to $138,300. (*Id.*) Christofferson attributed the entire difference to the value of the personal property.

During cross-examination, Christofferson disclosed that his unfurnished comparable sales were bank foreclosures. He stated that the use of foreclosure sales was appropriate because those were the only sales of unfurnished cabins available. He also stated that the foreclosure sales had been "market tested," meaning they had been listed for a short period before they were sold.

The evidence also includes buyers' reports of personal property's contributory value to the sales price of furnished cabins. (Ex C.) Those reports came in response to the county's "Residential Sales Questionnaire," which was sent to buyers immediately after sales. In 2012, one buyer attributed $70,000 of the cabin's purchase price to personal property; that same year, another buyer attributed $20,000. (Ex C at 1.) In 2013, a buyer set the value of the personal property at $50,000; in 2016, another buyer set the value at $15,000. (*Id.*)

Christofferson explained that the county used the questionnaires it received and other, unspecified market data to determine a county-assigned contributory value for personal property in sales of Brasada Ranch cabins. That county-assigned contributory value was $40,000 for 2012 cabin sales and $15,000 for cabin sales in 2013 and later. (*Id.*) Christofferson testified that he believed $15,000 was a reasonable contributory value for personal property in 2013, although he emphasized that the county had never received personal property returns and therefore did not have current information about the items in the accounts.

Christofferson briefly testified that a buyer of a two-bedroom cabin without furniture had purchased replacement furniture in 2012 for $36,000. (Ex D.) His written summary reported another buyer in 2011 had had a "difficult time finding replacement furniture" for a three-

///

bedroom cabin but estimated it would cost $25,000. (*Id*.) Yet another buyer in 2016 estimated replacement furniture would cost $30,000. (*Id*.)

C.    *Additional Evidence*

Taxpayers' expert, Hulick, offered her opinion that the correct values of the personal property accounts ranged from $3,020 for one of the two-bedroom cabin configurations to $3,610 for a three-bedroom cabin. (Ex 3.) Although not a licensed appraiser, Hulick based her opinion on her experience of over 35 years as an auctioneer valuing and selling personal property of all kinds.

Hulick valued the items of personal property at the amounts for which they would separately sell if liquidated in auctions at the cabins. She explained, for example, that a hot tub would sell for at most $200 because any buyer would factor in additional costs to disassemble it, move it, and reassemble it. Hulick typically sold individual lots of individual items (or sets of related items) because the items brought in more money when sold separately—although on one occasion in the past she sold a business as a whole after first attempting to sell its assets separately. Although Hulick's opinion of value was as of November 2017, she testified that none of the items would have been worth significantly more in 2011. Her reasoning was that the reduction in the personal property's value was primarily attributable to its being "used furniture" rather than its condition deteriorating over time.

Taxpayers' representative, Pratt, also prepared an estimate of the personal property values in the two- and three-bedroom cabins, based on his experience recently selling used furniture and on the "ItsDeductible" program from TurboTax. Pratt valued the component assets of the accounts separately. Pratt estimated personal property values ranging from $7,237 for a two-bedroom cabin to $8,192 for a three-bedroom cabin. (Ex 7 at 5, 8.)

In addition, taxpayers submitted photographs of the various items of cabin furnishing, coupled with Internet listings for items of similar appearance. With certain electronic items—such as a television set—taxpayers found identical model numbers listed. (*See* Ex 8 at 51–53) (television listed on eBay for $21 plus $10 shipping). With other items, listings were provided for items with similar—but not identical—appearance. For example, after a photograph of an area rug, multiple listings were provided—a 5'1" x 7'7" rug for $109.22, an 8' x 11' rug for $74.99, and a 5' x 8' rug for $61.59. (Ex 8 at 36–39.)

## II. ANALYSIS

The issue is the real market value of the personal property in the various accounts under appeal. Because the taxpayers seek affirmative relief, they must bear the burden of proof. *See* ORS 305.427.[5] That burden may be met by a showing that the necessary facts are "more probably true than false." *Cook v. Michael*, 214 Or 513, 527, 330 P2d 1026 (1958).

Business personal property is valued at its "real market value" as of January 1 and assessed at its "assessed value." ORS 308.250; *cf.* ORS 307.190 (exempting most personal property held for personal use). Each year, the Department of Revenue determines a threshold value, below which the assessment of a personal property account is canceled. ORS 308.250(2),(4). That threshold value was $12,500 in 2002 and is modified annually to remain proportional to changes in the U.S. City Average Consumer Price Index. *Id.*

Real market value is defined as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1). Appraisers have developed three methods of determining real market value, also known as

---

[5] The court's references to the Oregon Revised Statutes (ORS) are to 2009. The relevant statutes did not materially change during the years at issue.

approaches to value, which assessors are required to use when valuing property: the "sales comparison approach, cost approach, and income approach." OAR 150-308-0240(2)(a); ORS 308.205(2).

A.      *Highest and Best Use*

Implicit in all methods of determining real market value is consideration of the property's highest and best use (HBU). *Norpac Foods, Inc. v. Dept. of Rev.*, 18 OTR 41, 52 (2004) (avoiding rule construction that would eliminate consideration of HBU from valuation of personal property). Analysis of HBU "looks for the highest value that can be placed on an asset or group of assets, regardless of the fact that the component value or current aggregated value might be less." *Id*. at 51. Thus, HBU analysis will determine whether multiple components within a property account have a higher value separately or together. Value that is "attributable to the assembly of the parts into a unified or working whole" is known as "assemblage value." *Deschutes County Assessor v. Broken Top Club, LLC*, 15 OTR 231, 237 (2000). A property's HBU is the "first question that must be addressed in a credible appraisal" because it impacts the selection of comparable sales and properties. *Hewlett-Packard Co. v. Benton County Assessor*, 21 OTR 186, 188 (2013), *aff'd*, 357 Or 598, 356 P3d 70 (2015). An appraisal with an error about HBU is entitled to "little or no weight." *Id*. at 193.

Here, each subject account contains several dozen components and, without analysis, each of taxpayers' proposed valuations considered the components separately rather than as assembled. Hulick, the auctioneer, admitted on cross-examination that she had once sold business property for more collectively than she could get for it separately. The valuations prepared by both Hulick and Pratt resulted in values significantly less than $10,000 for 2017 and

/ / /

2012, respectively. Taxpayers' remaining valuation is given little weight because it was based on the opinion of a nontestifying expert.

Over and against taxpayers' calculations is one comparable sale: a three-bedroom cabin's assembled furnishings sold for $14,000 in 2010. Hulick's and Pratt's component values for subsequent years remain far below $14,000 if extrapolated back to 2010 at the county's 10-percent-per-year rate of depreciation.[6] The sale of the assembled furnishings for a price greater than taxpayers' estimates of their individual values is evidence that Brasada Ranch cabin furnishings were worth more collectively than they were individually.

It is reasonable that a rental cabin's furnishings would be worth more as assembled than individually. As taxpayers pointed out, the market generally assigns a low value to individual items of used furniture. However, the evidence shows there was a market for assembled cabin furnishings alongside the market for Brasada Ranch cabins. A cabin cannot generate rental income until it is completely furnished. Therefore, a complete set of furnishings in place generates value by avoiding lost rent during the time it would otherwise take to locate and assemble furnishings suitable to the cabins' décor and space requirements.

The court finds that the HBU of the property in the subject accounts was continued use as assembled together. Taxpayers' valuation methods relying on separate valuations of components are assigned little weight.

B.    *Value as Assembled*

The three approaches developed by the county did not make the same error about HBU because they all valued the subject properties' components as assembled. The county's appraiser

---

[6] The valuation based on the nontestifying expert's opinion concluded to values of $17,087 for a three-bedroom cabin and $14,111 for a two-bedroom cabin in 2012. By the county's straight line method, the values would have been $21,095 and $17,421 in 2010.

acknowledged that available market data was limited, and the large inconsistencies in the values indicated by each of the county's methods show that significant uncertainty remains.

First, the county looked to the contributory value reported by buyers immediately after their purchases of Brasada Ranch cabins. The questionnaire respondents in 2012 reported a wide range of values for a two-bedroom cabin's furnishings, ranging from $20,000 to $70,000. Based in part on those questionnaires, the county attributed $40,000 of cabin sale prices occurring through 2012 to personal property and $15,000 of cabin sale prices occurring through 2013.

Buyers' reports of the contributory value of personal property in a real property sale are doubtful evidence because they are not market transactions. In *Pfanmuller v. Department of Revenue*, 11 OTR 225, 233 (1989), this court found that a taxpayer's valuation of personal property derived from a buyer's allocation of motel sales prices between real and personal property did not sustain the burden of proof. A buyer's allocation is not "the market" because a buyer is free to assign any value without the seller's agreement. *See Pfanmuller*, 11 OTR at 233. Furthermore, some buyers might be tempted to overstate the contributory value of personal property, both to reduce their real property taxes and to reduce their personal income taxes through a depreciation deduction.[7] Particularly given the wide range of reported values, the court cannot assign much weight to the returned questionnaires.

The county also submitted a paired-sale analysis of cabins sold with and without furnishings. While that method is promising in theory, during cross-examination it emerged that the baseline sales of cabins without furnishings were both foreclosures—a fact the county's appraiser failed to disclose in his written summary. After an adjustment for location and time trending, the county's appraiser attributed the entire difference in sales price between the bank

---

[7] The latter incentive was noted at trial by one of taxpayers' representatives, who had himself returned a questionnaire reporting personal property contributory value of $50,000 in 2013.

sales and the arm's-length sales to personal property. Those differences generally exceeded $100,000.

Bank sales are unreliable as indicators of market value because, among other reasons, a bank may seek to sell foreclosed property quickly for the amount of the outstanding loan rather than its market value. The county's appraiser stated that those sales had been market-tested, meaning that they had been briefly listed before selling. However, the market listing does not account for the seller's incentive to accept any offer above the amount of the loan and the foreclosure costs. The county's paired-sale analysis thus attributes over $100,000 in value to used cabin furnishings that no one asserts cost that much when new. The result is not credible, and Christofferson admitted that the available market evidence was poor. Because the court has no way to distinguish what portion, if any, of the difference in sales prices was attributable to personal property as opposed to a foreclosure discount, the county's paired-sale analysis cannot be given much weight.

Finally, the county reported that a buyer of a two-bedroom cabin without furniture had purchased replacement furniture in 2012 for $36,000. The county's evidence does not show whether the replacement furnishings purchased in 2012 were used or new. If the furnishings were purchased new, their purchase price would require adjustment for comparison with the subject accounts at issue here, which were six years old in 2012. Under the county's 10-percent-per-year depreciation model, new furnishings worth $36,000 in 2006 would be worth 40 percent of that in 2012—$14,400. That number would be lower if the $25,000 estimated replacement cost of a three-bedroom cabin's furnishings provided by another buyer in 2011 is correct. Because the evidence does not show whether the replacement furniture was purchased new or

/ / /

used, the $36,000 reported replacement furniture cost supports a value of only $14,400 in 2012, and the other estimated costs support lower values.

Of all the evidence before the court, the best market-derived value clearly attributable to the cabin furnishings is the $14,000 for which a three-bedroom cabin's personal property was sold in 2010. There was no listing of that personal property; however, such a listing may not have been possible or even desirable given the limited market for assembled Brasada Ranch cabin furnishings. Because the furnishings matched the décor and size requirements of the Brasada Ranch cabins, its assemblage value was presumably higher to owners of Brasada Ranch cabins than to other purchasers. Although the cabin from which the furnishings were purchased was undergoing foreclosure, the furnishings were reportedly purchased from an individual owner, not a bank. An individual owner—as opposed to a bank—may be expected to retain the full proceeds of the sale and therefore has an incentive to get the highest price possible.

Although the evidence in this case is limited, it is enough to show the values on the tax rolls are likely overstated. Those values were based on a cost approach. In general, the cost approach is not preferred where the property at issue is not new. *See Gettman v. Dept. of Rev.*, TC 3388, WL 300719 at *2 (Or Tax Aug 5, 1993) (with reference to real property, stating that cost approach of "little weight where the property is not newly constructed and there are adequate comparable sales"). The personal property at issue here was six to twelve years old and reportedly had a depreciable life of only ten years. Further, "[c]ost is not a good measure of value where there is significant economic and functional obsolescence[.]" *Dept. of Rev. v. Grant Western Lumber Co.*, 15 OTR 258, 264 (2000). Here, the evidence suggests that equivalent replacement furnishings were purchased in 2011 and 2012 for between $25,000 and $36,000—a range of value significantly lower than the reported original value of the furnishings. That

suggests a superadequacy in the furnishings at the time of their original purchase, a form of functional obsolescence. *See Magno v. Dept. of Rev.*, 19 OTR 51, 60 n 11 (2006). Finally, the county did not explain the rationale of its straight 10-percent-per-year depreciation method, which appears to differ from the Department of Revenue's recommendations. As for the department's cost factor recommendations, no expert testimony was received as to their market basis or their application to the subject accounts. In sum, no reliable application of the cost method was developed by any party. By contrast, taxpayers located—and the county's appraiser verified—a comparable sale of similar personal property in 2010 for $14,000, an amount much lower than was placed on the tax roll for any of the subject accounts in 2011. That value was supported by the county appraiser's admission that $15,000 was a reasonable valuation of the personal property in 2013.

This court has jurisdiction to determine the correct real market value on the basis of the evidence, without regard to the values pleaded by the parties. ORS 305.412. The $14,000 purchase price of a three-bedroom cabin's furniture in 2010 is the best evidence available.

Although some adjustment for depreciation in subsequent years would hypothetically be reasonable, little evidence was presented supporting such an adjustment. The county's straight-line depreciation method was supported only by antiquity and rumors of other counties' processes. The Department of Revenue's cost factors had no defenders at trial. In opposition to either of those methods was testimony of Plaintiffs' auctioneer that the biggest decline in the value of individual furnishings occurs immediately upon sale and that subsequent annual declines are much less.

A market value of $14,000 derived from a single sale has a high degree of uncertainty. Subsequent annual declines in value would likely be much smaller than the range of uncertainty

in the initial value. Under those circumstances, the court finds the evidence is insufficient to support reducing the subject accounts' values below $14,000 for any of the years at issue.

Finally, the available evidence is inconsistent regarding the relative values of furnishings for three-bedroom and two-bedroom cabins. While one would expect the smaller cabins' furnishings to be worth less, the record is unclear. A two-bedroom cabin's furniture was replaced for $36,000 in 2012, while replacement costs for a three-bedroom cabin's furniture were estimated at $25,000 in 2011. While $14,000 is the best-supported value for the used furnishings of a three-bedroom cabin over the years at issue, the state of the evidence does not permit the court to determine a different value for a two-bedroom cabin's furniture.[8]

### III. CONCLUSION

The best market evidence of the subject personal property accounts' values supports a value of $14,000 for a three-bedroom cabin's furnishings in 2010, and the evidence is insufficient to support a reduced value for smaller cabins or for subsequent years. Now, therefore,

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[8] The county filed a motion to strike taxpayers' untimely filed post-trial brief on the relative value of the two- and three-bedroom cabins, and the taxpayers objected. Although the court initially requested briefing on the relative values of three- and two-bedroom cabin furnishings, upon further analysis the evidence does not permit derivation of one value as a proportion of the other. The county's motion to strike is therefore moot.

IT IS THE DECISION OF THIS COURT that the real market value of the subject personal property account was $14,000 for tax years 2011–12 through 2014–15.

Dated this ____ day of May, 2018.

_____
POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on May 15, 2018.*