# 𝕷𝖆𝖜 𝖆𝖓𝖉 𝕰𝖖𝖚𝖎𝖙𝖞

IN THE

# SUPREME COURT

OF THE

# STATE OF NEW YORK.

———•◦•———

## BLISS & HUBBARD *vs.* CUTTER & COYE.

When negotiable paper, or any other claim, about to fall due, is sent by the hold-
er to his agent, with general authority to collect it, and the agent, with the
evidence of such authority in his possession, calls on the debtor for payment,
the debtor is authorized to pay the claim, even before it is due.

The plaintiffs discounted a draft, drawn by B. on the defendants, and took, as
security for its acceptance and payment, a bill of lading for a lot of flour belong-
ing to B. which was shipped for and on account of the plaintiffs, to be held
"subject to the order of the cashier of the P. Bank," which bank was the
general collecting agent of the plaintiffs, at Buffalo. The plaintiffs indorsed
the draft to the bank or order, and sent it with the bill of lading, to the bank
for collection; and the defendants accepted the draft as an advance on the
flour, and before its arrival sold it, as the factors of B. On its arrival they were
unable to get possession of the flour without the order of the cashier, who re-
fused to deliver it, on the ground that he held it as security for the plaintiffs.
For the purpose of getting possession of the flour, in order to fulfill their con-
tract of sale, the defendants paid the draft, less the interest for the time it had
to run, received the cashier's order, and obtained the flour and delivered it to
their vendees, and received the proceeds. Before the draft fell due, the bank
failed, and no part of the money received by it, on the draft, was paid to the
plaintiffs. *Held,* that the plaintiffs must bear the loss occasioned by the fail-
ure of the bank.

THIS was a case submitted by the parties without action, under the 372d section of the code of procedure, upon the following case.

The plaintiffs were private bankers, and were doing business as such at Toledo, in the state of Ohio, under the name and style of Bliss & Hubbard. The defendants were commission merchants, and at the times herein specified were doing business as such, under the name and style of Cutter & Coye, at Buffalo, in the state of New York. On the 27th day of October, 1853, E. B. Brown, who was then at Toledo, drew his draft upon the defendants, of which the following is a copy:

"$4300.                                Toledo, Oct. 27, 1853.

Ten days after date, pay to the order of Bliss & Hubbard, forty-three hundred dollars value received, which place to account of                                              E. B. Brown.

To Mess. Cutter & Coye, Buffalo."

On the 28th day of October, 1853, the said E. B. Brown went to the plaintiffs, at Toledo, to get the draft discounted, and, as security for the acceptance and payment thereof, annexed to and delivered with the draft, a bill of lading, with directions written thereon, of which the following is a copy:

"Toledo, Oct. 28, 1853.

Shipped in good order, by E. B. Brown, as agent and forwarder, on board the prop. Montezuma, whereof Anderson is master, bound for Tonawanda, the following articles, which are to be delivered in like good order, (dangers of navigation only excepted,) unto the consignees or assigns, as marked and numbered in the margin.

In witness whereof the master hath signed two bills of lading of this tenor and date.

| Act. Bliss & Hubbard, | 181 | Bbls. Flour |
| care of J. R. Wheeler & Co., | | Charter Oak. |
| Tonawanda. | 151 | Brls. Flour |
| and Cutter & Coye, | | some stained. |
| Buffalo. | | Star City Mills. |
| | 398 | Brls. Flour |
| | | Franklin Mills. |

$730 C. C. Lake frt. 18, 131; 40.

Blisss *v.* Cutter.

Held subject to the order of Cash'r Patchin Bk.

Insured in Buffalo Mutual In. Co. for $3800.

J. S. Town, Clk."

The property mentioned in the bill was shipped that day, and belonged to said E. B. Brown. The plaintiffs discounted the draft and took the same, with the bill of lading attached, and indorsed the draft, " Pay Patchin Bank or order,—Bliss & Hubbard," and forwarded the same, on the same day, by letter, to the Patchin Bank, at Buffalo, for collection. The bill of lading, so attached, was in the form of the above copy. The Patchin Bank, on the 30th day of October, sent the draft, with the bill of lading attached, to the office of the defendants, in Buffalo, for acceptance, and the defendants accepted the same on that day, by writing across the face of the bill, the words " Accepted, Cutter & Coye." They at the same time detached from the draft the bill of lading and retained it. The property reached Tonawanda on the 2d day of November, 1853, and the defendants sent their order to Tonawanda for the property, but J. R. Wheeler & Co., to whose care, at that place, the flour was shipped, by reason of the directions on the bill of lading, that the flour was held subject to the order of the cashier of the Patchin Bank, refused to deliver it to the defendants or their order, without the order of such cashier. Thereupon the defendants went to the cashier of the Patchin Bank for his order, that the flour be delivered to them. The cashier told them he would not give such order, as the bank held the flour as security, on behalf of the plaintiffs, for the payment of the draft. Thereupon the defendants asked the cashier if he would give them an order for the flour, upon their paying to the bank the amount called for by the draft, the bank allowing the interest for the six days the draft still had to run. He consented so to do ; whereupon the defendants paid to the bank, on the 3d day of November, 1853, $4295.05, and he gave them the draft and wrote on the back of the bill of lading and delivered it to them, an order for the flour, in these words :

" Deliver the within to Cutter & Coye or order.

S. P. Stokes, Cashier."

The defendants obtained the flour on that order and sold it for $3992.03. On the 7th day of November, 1853, the Patchin Bank failed, and suspended payment, and the money has never been paid to the plaintiffs. They called upon the defendants for the money but the defendants refused to pay it, claiming that they had paid it as above stated. The acceptance of the defendants was made as an advance upon the property mentioned in the said bill of lading to E. B. Brown. The defendants, as the factors and commission merchants of the said E. B. Brown, had sold the property on the first of November, 1853, to arrive, and they paid the amount aforesaid, on their acceptance, for the purpose of getting possession of the flour, so that they could deliver it to the person to whom they had so sold it. The Patchin Bank, at the time of the payment of the said money, was a banking association under the statutes of the state of New York, and located in the city of Buffalo, with a capital of $100,000, and it was, at that time, reputed to be good and responsible. It was the agent of the plaintiffs at the city of Buffalo, during that year, for the purpose of making their collections. The amount paid by the defendants has never been placed to the credit of the plaintiffs on the books of the Patchin Bank.

*John Ganson,* for the plaintiffs.

*Henry W. Rogers,* for the defendants.

*By the Court,* Greene, J. The substance of the transaction, disclosed by the statement submitted in this case, out of which this controversy arises, is this. The plaintiffs discounted a draft drawn by Brown on the defendants, and took as security for its acceptance and payment, a bill of lading for a lot of flour belonging to Brown, which was shipped for and on account of the plaintiffs, to be held subject to the order of the cashier of the Patchin Bank, which bank was the plaintiffs' general collecting agent at Buffalo. The plaintiffs indorsed this draft to the bank or order, and sent it, with the bill of lading, to the

bank for collection. The defendants accepted the draft as an advance on the flour, and, before its arrival, sold it as the factors of Brown. On its arrival they were unable to get possession of the flour without the order of the cashier, subject to which it was to be held. The cashier refused to deliver it, on the ground that he held it as security for the plaintiff. And for the purpose of getting possession to deliver the flour in fulfillment of their contract of sale, the defendants paid the draft, less the interest for the time it had to run, received the cashier's order, and procured and delivered the flour to their vendees and received the proceeds. Before the draft fell due the bank failed, and no part of the money received by it on the draft has been paid to the plaintiffs.

On these facts the question is, which party must bear the loss occasioned by the failure of the bank. It is claimed by the plaintiffs that the bank, which had been appointed by them as their agent, for the purpose of collecting this draft, had no authority to receive the money until it became payable according to the terms of the draft; and that by paying it before it was due, the defendants thereby made the bank their agent, and consequently that the loss must be borne by them. The fact that the bank was a mere agent of the plaintiffs was known to the defendants, and the case undoubtedly depends upon the question as to the authority of the bank to receive payment of the draft before it fell due. That the bank was the general agent of the plaintiffs for the purpose of making their collections, and that it had authority to collect this draft, without any specific instructions or particular restrictions in relation to it, are conceded facts in the case. And the question is, whether the general nature of the agency, considered in connection with its subject matter, did not authorize the defendants to suppose that the bank had that power, and even justify the bank to the plaintiffs in exercising it. When a piece of negotiable paper, or any other claim about to fall due, is sent by the holder to his agent, with general authority to collect it, and with the evidence of such authority in his possession, the agent calls on the debtor for payment, is not the debtor authorized to pay that claim, even

before it is due? Is he not authorized to place the same confidence in the agent that his principal has done; and should not a payment thus made in good faith by the debtor, *where the rights of third persons have not intervened,* operate as an extinguishment of the claim, *as between him and the creditor?* Take the case of an attorney to whom a note is sent for collection: the maker is willing to pay, and does pay it, before it falls due, and in the mean time the attorney becomes insolvent; can the creditor say that the attorney had no authority to receive payment until the maturity of the paper, and thus repudiate his acts, and compel the maker to make good the loss which the creditor has sustained by his unfortunate selection of an agent? It is argued for the plaintiffs, that the authority to receive the money is specially restricted to the time when it becomes payable; that the authority is to collect the paper according to its tenor and effect, that is, when it becomes due, and *not before.* The authority, it is urged, is found in the plain terms of the instrument, and is limited by those terms, thus strictly and literally construed. If this be so, why is he not prohibited from receiving it *after* it becomes due, as well as before? The cases of *Parnther* v. *Gaitskill,* (15 *East,* 432;) *Burbridge* v. *Manners,* (3 *Campbell,* 193;) and *Morley* v. *Culverwell,* (7 *Mees. & Wels.* 174,) are cited by the plaintiffs in support of the position assumed by them. In *Parnther* v. *Gaitskill,* the defendant was the owner of a share in a literary institution in London, one of the rules of which was, that if any proprietor, being desirous of disposing of his share in the institution, should by writing under his hand signify the same to the managers, and mention therein the name, &c., of the person to whom he desired to transfer the same, such person (unless he was the legitimate son of the proprietor) should be balloted for at the next meeting of the managers; and if he should be approved of by two-thirds of the managers present, the share should be thereupon immediately vested in that person. The defendant put into the hands of one of the clerks of the institution a note, in the following words: "Gentlemen, having disposed of my share in the London institution to (here

a blank was left for the name,) I beg leave to have him elected in my place as a proprietor of the said institution." The plaintiff agreed with the clerk for the purchase of this share at £80, and the blank in the above letter was filled by the clerk. The letter, after this, remained in his possession, and was not presented to the committee, nor did he pay the £80 received from the plaintiff to the defendant, but absconded with it. Before the defendant was informed of this transaction he wrote the society a letter revoking all power and authority to transfer the said share, stating that he had not received the purchase money or had the name of any person submitted to him as the intended purchaser. The court held that until the name of the proposed purchaser had been submitted to the proprietor and approved by him, the sale was not complete, and consequently that the agent had no authority to receive the money. Lord Ellenborough says, "Every person who pays money beforehand, pays it at his own risk. The agent could not have claimed the money until it was due to the principal." And Bayley, J., says, "if goods are to be paid for on delivery, and the vendee will pay for them to one who acts as agent on behalf of the vendor, before they can be delivered, he thereby constitutes that person his own agent until the time when the money ought to be paid to him, and must stand to the loss if it be misapplied." This language seems to give some countenance to the plaintiffs' position in this case, but the decision was placed upon the ground that the sale had not been completed by the agent; that he had no authority to make a sale, but merely *to obtain a purchaser*, and when read in connection with the facts of the case and the avowed principle upon which the court proceeded, the language of the learned judges contains no authority for the plaintiffs. The cases of *Burbridge* v. *Manners*, and *Morley* v. *Culverwell*, were actions on negotiable paper which had been paid, and subsequently and before due had been received by the plaintiffs, for value, without notice. In the first case, Lord Ellenborough says, "payment means payment in due course and not by anticipation." In the latter case, Lord Abinger said, "the contract of the drawer and of each indorser is, that the bill shall be paid

by the acceptor at its maturity—not before it is due;" and Baron Parke adds, "I am of opinion that nothing will discharge the acceptor or drawer except payment according to the law merchant—that is, payment of the bill at maturity." Unquestionably this is so, as between a party who has once paid a negotiable bill and a *bona fide holder* who has afterwards received it for value, *before due.* The language above quoted from the opinions of these eminent jurists, when considered in connection with the facts of the cases, and restricted as it must be, in its *authority,* to those facts, is but a reiteration of this familiar principle. Payment at any time *as between the immediate parties* to negotiable paper, operates as an extinguishment of all liability upon it, but a different rule prevails when, by any means, that paper falls into the hands of a bona fide holder for value, before due. The question, then, still remains unanswered by authority, has the draft in question been paid *as between these parties?* and that resolves itself into a question as to the authority of the bank to receive this money before the draft fell due.

I think the error of the plaintiffs' position lies in the assumption that the terms of the draft comprehended and explicitly indicated, both to the defendants and the bank, all the power possessed by the latter in relation to the collection of the draft. This was a commercial transaction, and I think we may and must look beyond the terms of the paper, to the ordinary and well known course of business in such cases, for evidence of the intentions of the principal and the authority of the agent. It is no uncommon occurrence for those liable on commercial paper to provide for its payment, and actually to make payment to banks and other collecting agents, before it becomes due. Such payments, instead of operating to the prejudice of the holders, promote that promptness so essential to commercial transactions.

Looking at the character of the transaction and the relations of the parties, without limiting ourselves to the task of spelling or parsing out the authority by the literal meaning of the terms of the draft on the one hand, or seeking for it in any of the

Bliss *v.* Cutter.

special facts of this case on the other, we come to the question upon which the legal proposition involved in this case depends. What was the thing which the bank was authorized by the plaintiffs to do? It was to collect and receive the money due on this draft, and I see nothing in the authority thus conferred upon their agent, or in the subject matter to which it relates, indicating an intention on their part to prohibit the agent from receiving the money until *the day it fell due.* The case differs essentially from that of a bond and mortgage or other security having a long time to run, indicating a permanent investment on the part of the creditor of his funds, and an intention to keep them thus invested and secured. But that is not the case we have to decide; and it is unnecessary to intimate any opinion upon it.

In the case under consideration, the authority of the bank was to receive, as it was the object of the plaintiffs to procure, payment of this draft. The defendants have paid it, with the interest to the time of the payment, which was the value at that time of the money due upon it, and but for the unforeseen event of the failure of the bank, it would hardly have occurred to any one, and last of all to the plaintiffs, that that authority was limited to the day when the draft fell. due. To give legal effect to such an after-thought would, in my opinion, be doing violence to the previous intentions of all the parties, and injustice to the good faith with which the defendants have acted in this matter.

I think there should be judgment for the defendants, on the case.

[GENESEE GENERAL TERM, September 4, 1854. *Marvin, Bowen* and *Greene,* Justices.]