IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| FRERES LUMBER CO. INC., | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 200399R, 200400R, 210408G, |
| | ) | 210409G, and 210410G |
| v. | ) | |
| | ) | |
| LINN COUNTY ASSESSOR | ) | |
| and DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| Defendants. | ) | **DECISION** |

This appeal concerns the real market value (RMV) of a veneer plant, a plywood plant, and those plants' related machinery and equipment (M&E) for the 2020-21 tax year. This appeal also concerns the value of those properties and a mass ply panel (MPP)[1] plant (collectively, the subject properties) for the 2021-22 tax year.[2] A consolidated six-day trial of the five related cases was held in the courtroom of the Oregon Tax Court beginning on November 8, 2022. Cynthia Fraser and Paul Trinchero, attorneys with Foster Garvey, represented Plaintiff. Robert Freres Jr., Theodore "Tyler" Freres, Theodore "Kyle" Freres, Timothy Landolt (Landolt), and Donald Palmer testified as witnesses on behalf of Plaintiff. Marilyn Harbur and Sam Zeigler, Assistant Attorneys General, represented Defendant Department of Revenue. Eugene Karandy II, Linn County Attorney, represented defendant Linn County. Nicholas Bassis (Bassis), Kara Driskell (Driskell), and Darlene Johnson appeared as witnesses on behalf of Defendant Department of Revenue.[3]

---

[1] Defendant alternately describes this as the "Mass Plywood Product (MPP) Plant." (Def's Ex A at 5.)

[2] The subject properties correspond to the following accounts on the tax rolls. Veneer plant: 4610, 940705, and 4966; plywood plant: 851309 and 940711; MPP plant: 944356 and 6987.

[3] This decision hereinafter refers to Defendant because the Department of Revenue is the lead defendant.

Plaintiff's Exhibits 1, 2, 9 to 14, 16, 19, 20, 25 to 31, 41, and 44 were received into evidence. Defendant's Exhibits A to J were received into evidence.

## I. STATEMENT OF FACTS

Plaintiff, a century-old lumber company, operates a vertically integrated manufacturing system comprising five mills and plants spread across three sites located in the sparsely populated areas of Lyons and Mill City, Oregon. (Ptf's Ex 19; Ptf's Ex 1 at 33.) These facilities convert raw timber into green veneer, dry veneer, plywood, and engineered wood products. The subject properties include a veneer plant, a plywood plant, and an MPP plant. Each facility plays a distinct role within the production chain, and together they function as an interrelated economic unit.

The veneer plant is located just east of Lyons and consists of two tax lots: a 109.42-acre parcel and a 0.45-acre parcel. (Def's Ex A at 28.) It is improved with 150,184 square feet of production space, 60,020 square feet of enclosed storage space, 31,806 square feet of covered area, and 11,124 square feet of office space. (*Id*.) Structures include small and large log veneer lines, a stud mill, veneer drying facilities, and truck yard and maintenance buildings. (*Id*.) The site also contains a cogeneration facility that was excluded from the appraisal because it belongs to another entity. (*Id*.) Veneer produced at this facility is transported by truck five miles to the plywood plant in Mill City for further processing into plywood. (Ptf's Ex 1 at 33.)

/ / /

/ / /

/ / /

/ / /

/ / /

The plywood plant lies approximately 5.2 miles east of the veneer plant and spans two tax lots: a 38.66-acre parcel, and a 3.18-acre parcel. (Def's Ex A at 43.) Improvements total 233,325 square feet, consisting of 203,510 square feet of production space, 5,992 square feet of enclosed storage space, 16,767 square feet of covered area, and 7,056 square feet of office space. (*Id*.) This plant is primarily used to produce plywood and panels used in Plaintiff's MPP plant. (Def's Pre-Tr Mem at 3.)

The MPP plant, constructed in 2017, is located midway between the veneer and plywood plants. (Def's Ex A at 57, 63.) The site spans 58.27 acres, though only 18 acres are actively used in operations; the remainder is designated forest or excess land. (*Id.* at 57.) The MPP plant manufactures an emerging engineered wood product that competes with products such as cross-laminated timber. (Ptf's Ex 1 at 75.)

Valuation of the subject properties presented several challenges. The veneer and plywood plants were assembled over more than half a century, with piecemeal equipment upgrades and consistent maintenance that extended the lifespan of machinery well beyond typical depreciation schedules. Complicating matters, Plaintiff made a statutory election under ORS 308.411(2)(a) on June 26, 2019, opting to exclude the income approach from valuation and declining to provide income or expense itemizations. (Ptf's Ex 2 at 49.) Incorporating language from ORS 308.411(2)(a), the election form states,

> "The owner elects to have the property appraised and valued for ad valorem tax purposes excluding the income approach to valuation. I understand that the owner may not be required to provide any itemization of income or expense of the property for use in making an appraisal of the property. As a consequence of this election, there may be obsolescence that is not measurable."

(*Id.*)

/ / /

The parties took different approaches to value based on their interpretation of the consequences of the election above. Plaintiff applied work-around strategies to account for obsolescence while Defendant asserted that the lack of income and expense data rendered obsolescence unmeasurable.

A.      *Plaintiff's Evidence of Value*

Plaintiff's valuation evidence was presented through Landolt, a qualified appraiser with the American Society of Appraisers (ASA). Landolt has over 22 years of experience appraising forest product properties in the Pacific Northwest. He holds an undergraduate degree in mechanical engineering and an MBA. (Ptf's Ex 2 at 1484.) He prepared retrospective appraisal reports for the subject properties as of January 1, 2020, and January 1, 2021, using the cost and sales comparison approaches to valuation. (Ptf's Ex 1.) No income approach to value was developed, consistent with Plaintiff's election. Landolt determined that the highest and best use of the subject properties was their current industrial use. (Ptf's Ex 1 at 55.) He valued Plaintiff's veneer and plywood plants together, as if they were a single unit. (*See id.* at 64-83, 89 (comparing subject veneer and plywood plants with two facilities that process veneer and plywood under one roof).) Landolt apportioned approximately 55 percent of his original value conclusions to the veneer plant, and 45 percent to the plywood plant. (*See, e.g.*, *id.* at 3 (allocating $7.6 million to the veneer plant and $6.2 million to the plywood plant of the total $13.8 million for both for the 2020-21 tax year).) Landolt valued the MPP plant separately. (*Id.* at 94.)

/ / /

/ / /

/ / /

1.  *Plaintiff's cost approach*

Landolt's cost approach was based on the following formula: replacement cost new, less physical deterioration, less functional obsolescence, less external obsolescence, plus land value, plus construction in progress, equals the RMV. (Ptf's Ex 1 at 89.)

Landolt opted to start with replacement cost new rather than reproduction cost new because it is less complex and focuses on an equivalent utility or output. (*Id*. at 57.) He relied on two recently completed plywood and veneer processing facilities, a new lathe line installation, and other construction projects and cost quotes, all of which were built under one roof. (*Id*.) The first comparable was the Swanson Group's plywood and veneer facility in Springfield, which was destroyed by fire. (*Id*. at 63-64.) Based on the items and production capacity of the facility, Landolt calculated the replacement cost new at $105 million[4] as of January 1, 2020, and $110 million as of January 1, 2021. (*Id*. at 69.) The second comparable was the Winston Plywood and Veneer plant, in Louisville, Mississippi, reconstructed in 2014 after tornado damage, with an estimated replacement cost new at $80 million as of January 1, 2020, and $84 million as of January 1, 2021. (*Id*. at 75.)

Using those two comparables, Landolt estimated the replacement cost for the land, buildings, and machinery of Plaintiff's plywood and veneer facilities to be $90.4 million and $94.3 million for the 2020 and 2021 valuation dates, respectively. (*Id*.) The MPP plant's value was based on trending the recently constructed comparables, with minor adjustments due to the plant's uniqueness, estimated at $45.8 million. (*Id*. at 75-76.)

///

///

---

[4] The court uses rounded sale figures except in tables reproducing the parties' evidence.

a.     Physical deterioration

Having determined each plant's starting point (*i.e.*, replacement cost new) for the formula, Landolt proceeded to the next item: a subtraction for physical deterioration. Landolt estimated physical deterioration based on the expected service lives of the subject properties' various assets, rather than their actual ages, as much of the property was "in service for far longer than their placed in-service date would support." (Ptf's Ex 1 at 76.) Using Marshall Valuation Service and other factors, he estimated physical deterioration percentages for the plants as follows:[5]

|  | Plywood & Veneer Jan 1, 2020 Phys. Det. | Plywood & Veneer Jan 1, 2021 Phys. Det. | MPP Jan 1, 2021 Phys. Det. |
|---|---|---|---|
| Buildings & Structures | 37% | 41% | 4% |
| Site Improvements | 79% | 80% | 38% |
| Machinery & Equipment | 82% | 83% | 20% |
| Overall Phys. Det. | 74.6% | 76.0% | 15% |

(*Id.* at 77.)

b.     Functional obsolescence

The next step in Landolt's formula was to subtract estimated functional obsolescence. Landolt defined functional obsolescence as "the loss in value or usefulness of a property due to inefficiencies or inadequacies of the property itself, when compared to a more efficient or less costly replacement property that new technology has developed." (Ptf's Ex 1 at 77.) The deduction reflects that new machinery used to estimate value would typically be cheaper per unit of production due to requiring less labor and redundancy. (*Id.* at 78.) He adjusted for excess

---

[5] The data in this table is from Landolt's original report. (Ptf's Ex 1 at 77.) The court notes that the percentages associated with the plywood and veneer plants' machinery and equipment were revised during trial. (Ptf's Post-Tr Br at 16.) The court accounts for those revisions at the conclusion of this section.

operating costs, including transportation costs and labor costs for additional employees required to run multiple plants across separate sites as opposed to a single consolidated facility. (*Id.* at 78, 81.) Relying on 2019 Bureau of Labor statistics, Landolt estimated excess operating costs totaling approximately $10.8 million for 2020 and $10.1 million for 2021. (*Id.* at 81.)

   c.  Economic obsolescence

 Next, Landolt explained that economic obsolescence arises from external factors such as increased lumber costs, reduced product demand, increased competition, and environmental or regulatory issues. (Ptf's Ex 1 at 84.) While he acknowledged that this calculation is usually performed using the income approach, he quoted an ASA publication stating it can also be applied within the cost approach. Ultimately, due to "extremely volatile" market conditions in 2020 that "were expected to vary significantly in 2021 and 2022 before returning to historic trends," Landolt made no specific adjustments for the plywood and veneer plants for economic obsolescence. (*Id.*)

  However, Landolt did make an adjustment for the MPP plant due to several external factors. (*Id.* at 84-85.) For one, the process for obtaining structural certification of a relatively new product like MPP is subject to significant delays. MPP also faces competition with alternative markets. Furthermore, the COVID-19 pandemic slowed construction, which in turn slowed the design, use, and general acceptance of MPP. Finally, the failure of a building at Oregon State University constructed with a similar (but different) material further slowed market acceptance of MPP. (*Id.* at 85.)

 Landolt concluded that those challenges were "likely to result in a decrease in market value that a knowledgeable market participant would be willing to pay." (*Id.*) To quantify this external economic obsolescence, Landolt used an "inutility analysis" comparing maximum

capacity to actual production. As a new product facing limited demand, only a fraction of the plant's total capacity was being used. (*Id.* at 86-87.) Landolt used a formula that reflects that costs rise as production increases, but not in direct proportion, and calculated an inutility rate of 77.4 percent for the MPP plant. (*Id.* at 87.) Landolt also provided a "second market-based measure" to support his findings, referencing a bankruptcy sale of a cross-laminated timber plant that sold for 66 percent of its cost just two years after construction. (*Id.*) Landolt ultimately deducted $27.2 million for external economic obsolescence. (*Id.* at 89.) This deduction is 70 percent of the MPP plant's "replacement cost new less physical deterioration"—roughly midway between Landolt's calculated inutility rate of 77.4 percent and the supporting market-based measure of 66 percent.

> d. Land value

The next element in Landolt's cost approach formula is to add land value. Plaintiff accepted—and Landolt used—the actual tax roll land values for each tax account as follows:

| Plant | Account Number | Land Value | Year |
|---|---|---|---|
| Veneer | 4610 | $931,690 | 2020 |
| Veneer | 4610 | $968,960 | 2021 |
| Veneer | 4966 | $50,010 | 2020 |
| Veneer | 4966 | $53,030 | 2021 |
| Plywood | 851309 | $250,820 | 2020 |
| Plywood | 851309 | $260,860 | 2021 |
| MPP | 6987 | $518,470 | 2021 |

(Ptf's Ex 1 at 62; Ptf's Ex 2 at 7-8, 12, 29-30, 43.) Summing the values for the veneer plant's two accounts results in a land value of $981,700 for 2020 and $1,021,990 for 2021.

> e. Plaintiff's cost approach value conclusions

Under the replacement-cost-new approach, Landolt concluded the RMV, including "land, buildings, structures, site improvements, machinery & equipment, and construction-in-process"

had RMV of approximately $16.1 million for the veneer and plywood plants in 2020, $15.4 million in 2021, and $12.2 million for the MPP plant in 2021. (Ptf's Post-Tr Br at 20.) The values for each step of the calculation appearing in Landolt's report, organized by plant and assessment date, and reflecting revisions made at trial are:

|  | Plywood & Veneer Jan 1, 2020 | Plywood & Veneer Jan 1, 2021 | MPP Jan 1, 2021 |
|---|---|---|---|
| Replacement Cost New | $90,366,000 | $94,265,000 | $45,790,431 |
| Less Physical Deterioration | - $64,704,000 | - $70,217,000 | - $6,891,684 |
| Less Functional Obsolescence | - $10,830,000 | - $10,088,000 | - |
| Less External Economic Obsolescence | - | - | - $27,229,000 |
| Plus Land | + $1,232,520 | + $1,282,850 | + $518,470 |
| Plus Construction in Process | - | + $113,130 | - |
| Equals RMV | $16,064,520 | $15,355,980 | $12,188,217 |

(*Id.* at 16, 21.)

2. *Sales comparison approach*

Landolt conducted a sales comparison analysis for the veneer and plywood plants using seven lumber mill transactions, adjusting for production capacity. (Ptf's Ex 1 at 90.) Landolt used those seven sales as comparables for valuation purposes. (*Id.* at 91.) Those sales are summarized as follows:

|  | Sale Date | Location | Adjusted Sales Price[6] | Adj Sales Price Per Unit Prod |
|---|---|---|---|---|
| Sale 1 | Feb 2004 | Yakima, WA | $1.0 million | $4.03 |
| Sale 2 | Apr 2004 | Creswell, OR | $2.9 million | $11.60 |
| Sale 3 | Dec 2005 | Eugene, OR | $3.7 million | $16.44 |
| Sale 4 | Jul 2007 | Elma, WA | $5.6 million | $18.75 |
| Sale 5 | Aug 2007 | Springfield, OR | $2.2 million | $9.43 |

---

[6] To enable an "apples to apples" comparison with Plaintiff's cost per unit production, Landolt adjusted the comparables' total sales prices by deducting estimated values for land, personal property, and other assets. (*See* Ptf's Ex 1 at 91.)

| Sale 6 | Oct 2007 | Springfield, OR | $3.1 million | $12.45 |
| Sale 7 | Nov 2017 | Sweet Home, OR | $4.7 million | $15.67 |

(*Id.*)

Landolt used the adjusted comparables to estimate a value for the subject properties' price per unit of production in 2020 and 2021. He grouped Plaintiff's production types according to similar production costs: small log and ply at $18 per unit of production, and large log veneer at $15 per unit of production. Applying those per-unit values to Plaintiff's production, Landolt computed values of $4.5 million and $4.7 million respectively for those production types. Adding these to the values of Plaintiff's land and personal property, Landolt computed the plywood and veneer plants' total value for 2020 as a rounded $14.4 million, and $15.0 million for 2021. (*Id.* at 91; Ptf's Post-Tr Br at 21.)

Landolt did not use a sales comparison approach for the MPP plant because it was the only facility of its kind. (Ptf's Ex 1 at 92.)

3.    *Plaintiff's value reconciliation*

Acknowledging limitations in both the cost and sales comparison approaches, Landolt reconciled the two by averaging their conclusions, resulting in values of $15.4 million (2020-21) and $15.2 million (2021-22) for the veneer and plywood plants. He relied exclusively on the cost approach for the MPP plant, concluding a value of $12.2 million for 2021-22. These values account for adjustments made during trial. (Ptf's Post-Tr Br at 59.)

B.    *Defendant's Evidence of Value*

Defendant called three witnesses in support of its valuation of the subject properties. Like Plaintiff, Defendant considered the cost and sales comparison approaches but separately valued the land, improvements, and machinery, for the veneer, plywood, and MPP plants, and added the values together. Defendant placed much significance on Plaintiff's election under

ORS 308.411(2)(a) and determined that obsolescence was not measurable without Plaintiff's income and expense data, referencing OAR 150-308-0280.

Bassis has been working as an appraiser for Defendant since 2016. (Def's Ex A at 138.) He has worked on several industrial appeals. He previously was a residential appraiser in Hawaii. Bassis limited his appraisal of the land and improvements to the real property. (*Id.* at 3.) He concluded that the five-mile separation between the facilities is "consistent with current competitive business practices and there is no factual basis to conclude that it is a detriment." (*Id.* at 4.) Further, Bassis emphasized that Plaintiff's election precluded a reliable measurement of functional or economic obsolescence, and instead relied on comparable sales to extract depreciation. Bassis's cost approach applied land sales data, Marshall & Swift cost estimations, and a depreciation adjustment based on market-derived rates. (*Id.* at 4, 75.) Bassis divided the subject property into three sites and valued each one separately. (*Id.* at 4.)

1. *Defendant's cost approach – real property*

Bassis first analyzed the subject properties' land values. (*Id.* at 72.) He selected six comparable land sales from 2018 through 2021, ranging in size from 5.1 to 94.1 acres. Bassis created a graph with a best fit line, showing that price per acre decreased as parcel size increased. Based on those sales, he determined the veneer plant's 109.87 acres at $7,081 per acre, for a total of $777,976. He determined the plywood plant's 41.84 acres to be worth $11,029 per acre, for a total of $461,458. Finally, he valued the MPP Plant's 58.27 acres at $9,474 per acre, yielding a value of $552,022. Bassis considered the information available and concluded that no adjustments were necessary to account for the time between the 2020 and 2021 assessment dates. (Def's Ex A at 74.) These totals compare to the tax roll land values accepted by Plaintiff as follows:

| Plant | Year | Tax Roll Land Values | Bassis's Land Analysis |
|-------|------|----------------------|------------------------|
| Veneer | 2020 | $981,700 | $777,976 |
| Veneer | 2021 | $1,021,990 | $777,976 |
| Plywood | 2020 | $250,820 | $461,458 |
| Plywood | 2021 | $260,860 | $461,458 |
| MPP | 2021 | $518,470 | $552,022 |

The next step in Bassis's cost analysis was estimating the replacement cost new of the buildings and site improvements using the Marshall & Swift Valuation Service program. For the veneer plant, Bassis calculated yard improvements, including 700,000 square feet of four-inch asphalt with a three-inch rock base capable of supporting heavy trucks and equipment, to have a value of $6,682,640. (Def's Ex A at 81.) He performed similar calculations for the plywood and MPP plants, estimating the costs of yard improvements at $1,798,498 and $1,453,075 respectively. (*Id.* at 82.)

Bassis examined the fire protection coverage required for the properties, estimating that yard improvements accounted for 45 percent of the total replacement cost for the veneer plant, compared to 19 percent and 12 percent for the plywood and MPP plants, respectively. (*Id.* at 83.)

Bassis next considered depreciation in the forms of physical deterioration, functional obsolescence, and external obsolescence. For physical deterioration, he analyzed five industrial property sales, calculated the cost new for the buildings, subtracted the land value, and computed an average projected depreciation. (Def's Ex A at 84.) He determined the physical deterioration rates for the veneer plant's building and yard improvements to be 50 percent for 2020-21 and 51.3 percent for 2021-22 tax years. (*Id.* at 88.) The plywood plant's rates were 60 percent and 61.3 percent, respectively. Bassis estimated that the MPP plant's main production warehouse and associated yard improvements had a depreciation rate of 4 percent for 2021-22. Remaining

structures at that property, which were older than the main production warehouse, were assigned a 41.3 percent deterioration rate. (*Id.*)

Bassis addressed functional obsolescence by comparing the subject property's operations to the most cost-effective business practices and found they did not constitute a detriment. (Def's Ex A at 93.) However, he testified it was not possible to calculate functional obsolescence without Plaintiff's income and expense data, citing OAR 150-308-0280.

Regarding economic obsolescence, Bassis again noted that such calculations required income and expense data, which were unavailable due to Plaintiff's election. (Def's Ex A at 95.) He opined that the sales comparison approach already accounted for all forms of depreciation and used those comparables to extract depreciation rates. Thus, further calculations for obsolescence were unnecessary. (*Id.*)

In summary, under the cost approach, Bassis concluded the veneer plant's land and improvement values to be $8.2 million for 2020, and $8.1 million for 2021. (Def's Ex A at revised 98.) The plywood plant's values were $4.37 million for 2020, and $4.33 million for 2021. (*Id.* at revised 101.) The MPP Plant's value was $12.3 million for 2021. (*Id.* at revised 103.)

2. *Defendant's sales comparison approach – real property*

Bassis selected seven sales of industrial property for comparison. Comparable 1 was a 400,000-square-foot wood products manufacturing facility with rail access located in Prineville that was partially damaged, leaving 10,000 square feet occupiable. This property sold in January 2020, with an adjusted price, excluding land, of $1.8 million. (Def's Ex A at revised 105, original 106.) Comparable 2 was a 300,000-square-foot multi-tenant, general use industrial warehouse located in Springfield, which sold in June 2018 for an adjusted sales price of $4.7

million, excluding land. (*Id.* at 107.) Comparable 3 was a 120,000-square-foot former veneer processing plant located in Glendale, which sold in September 2019 for $2.4 million. (*Id.* at revised 105, original 108.) This property had a deed restriction preventing its use in the wood products industry. (*Id.* at 108.) Comparable 4 was a 140,000-square-foot former wood products manufacturing facility in Cottage Grove that sold in March 2019 for $4 million. (*Id.* at 109.) Comparable 5 was a 100,400-square-foot industrial distribution warehouse in Sherwood, which sold in September 2018 for $10.6 million. (*Id.* at 110.) Comparable 6 was a 202,743-square-foot former industrial warehouse originally built by Xerox in Wilsonville, which sold in October 2018 for $13.9 million. (*Id.* at 111.) Comparable 7 was a 239,072-square-foot multi-tenant general use industrial distribution warehouse built in 2017 in Donald, which sold in October 2018 for $22.4 million. (*Id.* at 112.) Bassis testified that he selected properties, mostly consisting of large industrial warehouses, in various locations because he was unable to locate contemporaneous sales of similar properties in the geographical area of the subject property.

Bassis adjusted for sales dates based on a paired sales analysis of six properties in the Portland, Beaverton, and Hillsboro metropolitan areas (market trends). (Def's Ex A at 114.) Based on the paired sales and data from CoStar regarding Linn County, he applied a five percent yearly appreciation rate. Bassis acknowledged that the land values reflected in his paired analysis were high and adjusted each comparable sale by subtracting estimated land values.

In addition to adjusting for market trends and subtracting land values, Bassis also adjusted for miscellaneous repairs and M&E. (*Id.* at revised 123, original 124.) Based on those adjustments, Bassis found that the seven comparable sales had the following adjusted values per square foot:

/ / /

| Comparable | Sale Date | Location | Adj Value (Bldgs Only) Per Sq Ft |
|:---:|:---:|:---:|:---:|
| 1 | Jan 2020 | Prineville, OR | $7.59 |
| 2 | Jun 2018 | Springfield, OR | $15.68 |
| 3 | Sep 2019 | Glendale, OR | $20.29 |
| 4 | Mar 2019 | Cottage Grove, OR | $28.90 |
| 5 | Sep 2018 | Sherwood, OR | $105.54 |
| 6 | Oct 2018 | Wilsonville, OR | $68.47 |
| 7 | Oct 2018 | Donald, OR | $93.64 |

(*Id.* at revised 105, 119-20, original 121.)

For the veneer plant, Bassis reconciled the value by bracketing comparable sales 1 through 4. Those sales had a low adjusted value of $7.59 per square foot, a high of $28.90, and a median of $17.99. Bassis concluded that $26 per square foot was the most indicative value. (*Id.* at revised 125.) Using that value per unit and adding the land value of $777,976, Bassis calculated a total value for the veneer plant of $7.35 million for the 2020 assessment date and $7.69 million for the 2021 assessment date.

For the plywood plant, Bassis used the same method as for the veneer plant. He identified a low comparable of $4.78 per square foot, a high of $25.65 per square foot, and a median price of $13.38 per square foot.[7] His outcome was a reconciled value of $23.50 per square foot. Adding the land value of $461,458, Bassis concluded a total value of for the plywood plant of $5.9 million for the 2020 assessment date and $6.2 million for the 2021 assessment date. (*Id.* at revised 126.)

For the MPP plant, Bassis bracketed comparable sales 5 through 7 and identified a low comparable value of $68.47 per square foot, a high of $105.54 per square foot, and a median price of $93.64 per square foot. His outcome was a reconciled value of $80 per square foot.

---

[7] Bassis's report does not explain where the low of $4.78 and high of $25.65 came from, as neither of those figures appear in the discussion or analysis grid of comparable sales. (Def's Ex A at revised 123, 126.)

Adding the land value of $552,022, he calculated a total value of $15.6 million for the MPP plant in 2021. (*Id.* at revised 127.)

    3.    *Defendant's reconciliation of approaches to real property value*

Bassis gave the cost approach less weight for the veneer plant and plywood plant because of their age and the uncertainty in estimating depreciation. He found the sales comparison approach a better indicator of value for those plants. As to the MPP plant, Bassis gave the cost and sales comparison approaches equal weight because the data used in the cost approach did not include potential adverse factors related to the rural location of the plant.

Bassis's final conclusions of value for land and improvements are as follows:

| Facility | 2020-21 Land & Improvements | 2021-22 Land & Improvements |
|---|---|---|
| Veneer plant | $7,350,000 | $7,688,535 |
| Plywood plant | $5,900,000 | $6,218,752 |
| MPP plant | *Not appealed* | $14,000,000 |

(Def's Ex A at revised 130, 132, original 133.)

    4.    *Defendant's M&E values*

In determining the subject properties' total RMV, Defendant relied on a second appraisal of Plaintiff's M&E by Driskell, separate from Bassis's valuation of land and improvements. Driskell began her appraisal career in Marion County in 2004 primarily performing residential, farm, forest and small commercial appraisals. She joined Defendant as an appraiser in 2016 and is currently a Principal Appraiser Analyst (IV). (Def's Ex C at 96.) Her assignment was to develop a RMV for the M&E contained in the subject properties.

/ / /

/ / /

/ / /

/ / /

Driskell prepared a M&E appraisal report for the 2020-21 and 2021-22 tax years. She determined that the highest and best use of the facilities to be as a going concern. (*Id.* at 16.) However, she valued the machinery at each plant separately. (*Id.* at 3.) She concluded that functional and economic obsolescence could not be measured without Plaintiff's income and expense data. (*Id.* at 27-28.)

Driskell used the cost approach exclusively to estimate the value of the M&E due to a lack of available data for used equipment. (Def's Post-Tr Br at 14 n 7.) She employed two methods. Driskell used the Trended Investment Cost Method (TICM), which begins with the original cost of the equipment and applies adjustments based on economic data. She also used a cost estimate from a supplier to reproduce Plaintiff's processes, adjusted back to the assessment date. This second "turn-key" estimate doubled the cost of the machinery to account for delivery and installation. (Def's Ex C at 39.) Driskell accounted for physical deterioration through "observation and age/life analysis." (Def's Ex C at 26; *see also, e.g.*, *id.* at 36-37.)

After compiling, evaluating, and reconciling data for all three plants, Driskell summarized the M&E values as follows:

| Plant | Year | M&E RMV |
|-------|------|---------|
| Veneer | 2020 | $30,986,386 |
| Veneer | 2021 | $29,387,955 |
| Plywood | 2020 | $23,283,856 |
| Plywood | 2021 | $22,624,959 |
| MPP | 2021 | $26,070,279 |

(*Id.* at 78.)

5.    *Defendant's total value conclusions*

Combining the results of Bassis's and Driskell's reports, Defendant's total RMV conclusions for the veneer and plywood plants for the 2020-21 tax year were as follows:

| Plant | Component | Account | 2020-21 RMV |
|---|---|---|---|
| Veneer | Land, Buildings, Structures | 4610 | $7,087,458 |
| | Land, Buildings, Structures | 4966 | $262,542 |
| | Machinery & Equipment | 940705 | $30,986,386 |
| | **Veneer Plant Total:** | | **$38,336,386** |

| Plant | Component | Account | 2020-21 RMV |
|---|---|---|---|
| Plywood | Land, Buildings, Structures | 851309 | $5,433,900 |
| | Land, Buildings, Structures | 7829 | $466,100 |
| | Machinery & Equipment | 940711 | $23,283,856 |
| | **Plywood Plant Total:** | | **$29,183,856** |

(Def's Post-Tr Br at 27-28.) Defendant's total RMV conclusions for all three plants for the

2021-22 tax year were as follows:

| Plant | Component | Account | 2021-22 RMV |
|---|---|---|---|
| Veneer | Land, Buildings, Structures | 4610 | $7,413,901 |
| | Land, Buildings, Structures | 4966 | $274,634 |
| | Machinery & Equipment | 940705 | $29,387,955 |
| | **Veneer Plant Total:** | | **$37,076,490** |

| Plant | Component | Account | 2021-22 RMV |
|---|---|---|---|
| Plywood | Land, Buildings, Structures | 851309 | $5,727,470 |
| | Land, Buildings, Structures | 7829 | $491,281 |
| | Machinery & Equipment | 940711 | $22,624,959 |
| | **Plywood Plant Total:** | | **$28,843,710** |

| Plant | Component | Account | 2021-22 RMV |
|---|---|---|---|
| MPP | Land, Buildings, Structures | 6987 | $14,000,000 |
| | Machinery & Equipment | 944356 | $26,070,279 |
| | **MPP Plant Total:** | | **$40,070,297** |

(*Id.*)

/ / /

/ / /

/ / /

/ / /

## II. ANALYSIS

The issue before the court is the RMV of Plaintiff's veneer and plywood plants, including M&E, for the 2020-21 tax year. The appeal also includes those plants plus Plaintiff's MPP plant for the 2021-22 tax year. RMV is defined in ORS 308.205(1),[8] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment dates for the 2020-21 and 2021-22 tax years are January 1, 2020, and January 1, 2021, respectively. ORS 308.007(1)(a); ORS 308.210(1). The RMV of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). The three approaches to value that must be considered are: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. ORS 308.411(1); OAR 150-308-0260(3)(a).[9] Although all three approaches must be considered, all three approaches may not be applicable for all cases. OAR 150-308-0260(3)(a).[10] The court has jurisdiction to determine the RMV or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties. ORS 305.412. Nevertheless, Plaintiff bears the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427.

///

///

---

[8] The court's references to the Oregon Revised Statutes (ORS) are to the 2019 edition.

[9] Oregon Administrative Rules (OAR).

[10] *See Seneca Sustainable Energy, LLC v. Dept. of Rev.*, 363 Or 782, 799, 429 P3d 360, 370 (2018) ("Under OAR 150-308-0260(3)(a), appraisers must use all three approaches when determining RMV of industrial property. However, that rule recognizes that some approaches cannot be applied to a particular property.")

A.      *Impact of Plaintiff's Election Under ORS 308.411(2)(a)*

Recognizing that some owners of industrial facilities wish to forgo opening the operation's income and expense records to an appraiser for property tax valuation purposes, ORS 308.411(2) allows an election. The owner may elect to exclude use of the income approach to valuation. The statute provides the following options for the election:

> "The owner of a plant may elect to have the plant appraised and valued for ad valorem property tax purposes excluding the income approach to valuation. An owner making an election under this subsection must further determine which of the following paragraphs is applicable to the election:
>
> (a) If this paragraph applies to the election, the owner may not be required to provide any itemization of income or expense of the industrial plant for use in making an appraisal of the plant for ad valorem property tax purposes; or
>
> (b) If this paragraph applies to the election, the owner may not be required to provide any itemization of income of the industrial plant for use in making an appraisal of the plant for ad valorem property tax purposes, but may be required to provide an itemization of operating expenses of the industrial plant for use in measuring functional obsolescence in a market data approach or cost approach to valuation."

*Id.*

Based on Plaintiff's election under ORS 308.411(2)(a), Plaintiff did not provide income and operating expenses to Defendant. Plaintiff's election under ORS 308.411(2)(a) precludes introduction of evidence relating to the income approach, which in turn precludes any and all consideration of that approach. ORS 308.411(5). Defendant argued that the election also means that "neither party could reliably measure any functional obsolescence that might affect the Subject Plants." (Def's Post-Tr Br at 9.)

/ / /

/ / /

/ / /

Plaintiff disagreed and argued that,

> "an appraiser should consider the same factors that a buyer or seller of an industrial property would * * *. And buyers and sellers are familiar with the cost of new construction, the physical attributes and condition of the plant being reviewed, the operating characteristics of the subject in comparison with a modern plant, and the economics."

(Ptf's Post-Tr Br at 4 n 5 (internal quotation omitted).)

Indeed, Plaintiff's position is supported by changes to the statute by the legislature in 1995, which removed statutory language that excluded consideration of functional and economic obsolescence. Or Laws 1995, ch 724, §1. The court agrees with Plaintiff's interpretation, finding no legal prohibition against considering obsolescence. This court has previously noted the effects of the change to the 1995 law. *Dept. of Rev. v. Grant Western Lumber Co.*, 15 OTR 258, 260 n 2 (2000). Thus, despite making the election under ORS 308.411(2)(a) to preclude consideration of the income approach, evidence regarding obsolescence *may* be considered.

B.    *Highest and Best Use*

Because this is an industrial property appeal, and the evidence shows the highest and best use of each property is as an operating plant, the court must value each of the facilities as a "going concern." OAR 150-308-0260(2) states,

> "If the highest and best use of the unit of property is an operating plant or an operating integrated complex, the real market value will be considered to be a 'going concern.' The going concern concept recognizes that the value of an assembled and operational group of assets usually exceeds the value of an identical group of assets that are separate or not operational."

While this rule "acknowledges that assembled value usually is greater, * * * it is possible that it may be less than the total of its parts." *Grant Western Lumber*, 15 OTR at 263. Further, "[t]he market value of a unit of property must not be determined from the market price of its component parts, such as wood, glass, concrete, furnaces, elevators, machines, conveyors, etc.,

each priced separately as an item of property, *without regard to its being integrated into the total unit.*" OAR 150-308-0260(3)(b) (emphasis added).

The parties do not explicitly dispute the veneer and plywood properties' highest and best use as a single, vertically integrated unit. However, Defendant's approach effectively evaluates individual components of each of the subject properties and then recombines them. Under OAR 150-308-0260(3)(b), this piecemeal approach is not allowable *unless* regard is given for the property's value as assembled. No such regard is offered here for two reasons. First, Defendant simply adds the values from Bassis's report to the values from Driskell's report without any discussion of whether or how this increases or decreases each plant's value. Second, Defendant's valuation includes no estimate for functional or economic obsolescence. In omitting estimates for these deductions, Defendant disregards key aspects of each plant's assembled value.

Landolt valued the veneer and plywood plants as a single going concern in part because the veneer operation feeds the plywood operation, so the two largely operate as an integrated enterprise. This is in line with modern plywood facilities, which typically process veneer and plywood at a single site. While Landolt lacked access to Plaintiff's financial statements and operating costs, he made reasonable estimates for functional and economic obsolescence for the veneer and plywood plants resulting from, among other things, operating at two sites rather than one. As discussed above, Defendant instead valued land, site improvements, buildings, machinery, and equipment separately. Plaintiff's evidence was more in line with the department's rule for valuing the market value of the subject property as a "total unit." OAR 150-308-0260(3)(b).

/ / /

In *Grant Western Lumber*, this court emphasized that industrial facilities should be valued based on their utility as a whole, rather than as the sum of their parts. 15 OTR at 263. Defendant's segmented approach ignores the operational interdependence of the facilities. Plaintiff's methodology better captures the integrated nature of the subject properties.

C.    *The Cost Approach*

Given the limitations imposed by Plaintiff's election and the lack of reliable comparable sales, the court finds the cost approach to be the most appropriate valuation method. As noted in *Boise Cascade Corporation v. Department of Revenue*, 12 OTR 263, 266 (1991), appraising industrial properties is as much an art as a science, requiring the court to evaluate the credibility and reliability of expert testimony.[11] In that regard, the court finds the picture painted by Plaintiff generally more persuasive.

As discussed above, Defendant's approach did not adjust for obsolescence, citing Plaintiff's election. Defendant attempted to use a TICM approach, but it ignored the difference in efficiency of new machines over older machines. This approach did not accurately reflect the qualities noted in the subject properties. Plaintiff also started with replacement cost new but made adjustments focused on output capacity. That approach is generally more persuasive as described below.

1.    *Functional obsolescence*

Landolt considered several factors for functional obsolescence such as the dual existence of a small log and large log mills, physical separation of the veneer production, veneer drying,

---

[11] "If appraising, as an art, can be likened to painting, market value is a medium of watercolors, not painting by numbers. In applying the concept of market value, the appraiser must intentionally blur some lines and soften the edges of others. The appraiser seeks a visual representation of an ideal, not some specific reality. This point is essential in property taxation." *Boise Cascade Corp.*, 12 OTR at 266.

and plywood production requiring trucking, and older machinery requiring excess personnel. Bassis testified that other mills had physical separation of facilities and, as such, the court need not consider Plaintiff's facilities' separation as obsolescence. OAR 150-308-0280(3)(c) states in part:

"Functional Obsolescence is a loss in market value of a subject property when there is a reasonable feasibility of a typical prospective purchaser acquiring, without undue delay, a replacement property possessing an equivalent utility but is more cost-effective in terms of design, materials, or equipment."

Defendant's argument that physical separation between facilities is common in other mills does not negate the obsolescence caused by inefficiencies specific to the subject properties. Plaintiff's analysis was more persuasive on this issue.

2.    *Economic obsolescence of the MPP plant*

Landolt employed an "inutility" analysis, comparing actual production to capacity to estimate economic obsolescence for the MPP plant. That analysis was based on a formula involving the actual production of the facility versus its maximum capacity and recognizing that costs do not go up in proportion to production. That calculation resulted in a reduction in value of over 77 percent. The extent of the reduction based on a minute data set brings the accuracy of the method into question. As a secondary check, Plaintiff presented evidence of a recent bankruptcy sale of a facility only two years old and producing a related product for only 66 percent of its cost.

Landolt's testimony on this economic obsolescence was not persuasive because examining the capacity of a new business does not necessarily reveal only the effect of external economic obsolescence. New business models often take time to build up market attention and production levels. The MPP plant's actual production in 2020 does not necessarily justify such a significant reduction in value to an informed buyer. Further, the bankruptcy value presented was

not persuasive, as that sale was merely one part of a larger restructuring plan and therefore not representative of typical market conditions. Plaintiff has not presented persuasive evidence on an economic obsolescence deduction for the MPP plant.

D.     *The Sales Comparison Approach*

Plaintiff presented seven comparable sales but acknowledged that sales of these types of properties are rare and often involve financial distress. These sales were outdated—all but one having occurred prior to 2008. In *Freedom Federal Savings and Loan Association v. Department of Revenue*, 310 Or 723, 728, 801 P2d 809 (1990), the court rejected comparable sales that did not reflect the economic realities of the subject property. Plaintiff's comparables suffer from similar deficiencies. Accordingly, Plaintiff's sales comparables are not reliable indicators of value.

While Defendant's seven comparable sales were more recent and geographically proximate, they failed to align with the highest and best use of the subject properties. Defendant's extraction method, which subtracted land values from total sales and compared building values only, results in attenuated comparisons. For this reason, the court does not find Defendant's sales comparables persuasive either.

E.     *M&E Values*

The parties presented competing approaches to M&E. Plaintiff's appraiser did not separately appraise M&E. Defendant's appraiser, Driskell, developed her valuations using the cost approach exclusively, applying both the TICM and a "turn-key" cost estimate of new equipment adjusted for delivery and installation.

Driskell concluded that, due to Plaintiff's election under ORS 308.411(2)(a), functional and economic obsolescence could not be reliably measured. However, this court has already

determined that Plaintiff's election does not preclude consideration of obsolescence where it is supported by the evidence. Driskell accounted for physical deterioration but failed to account for functional or economic obsolescence, despite relying on replacement cost figures that assume modern, fully efficient operations. That omission overstates the value of equipment, most of which has been in use for decades.

Although Driskell's methodology was methodical and well-documented, the lack of any adjustment for obsolescence undermines its reliability. Conversely, Plaintiff's appraiser incorporated obsolescence into the integrated valuation but did not separate the equipment component.

Given these limitations, the court finds Defendant's equipment values overstated. The court finds the integrated approach presented by Plaintiff for the veneer and plywood plants more persuasive. As for the MPP plant, Defendant's separate valuation of M&E is more credible, given the plant's recent construction, whereas Plaintiff's economic obsolescence analysis was not persuasive.

## III. CONCLUSION

After careful consideration of the testimony, exhibits, and arguments presented, the court concludes that Plaintiff's integrated valuation approach more accurately reflects the RMV of the veneer and plywood plants as of the applicable assessment dates. Consistent with Landolt's apportionment, the court assigns 55 percent of the total value to the veneer plant and 45 percent to the plywood plant. Once those values are assigned to each plant, the court further apportions them to each tax account appealed using the same proportion of the total RMV that each tax account represented for a given year.[12] Plaintiff did not present persuasive evidence to support

---

[12] For example, for the 2020-21 tax year, Plaintiff has appealed two accounts associated with the plywood plant: 851309 for land and structures, and 940711 for machinery and equipment. Plaintiff's 2020-21 property tax

its significant deduction for economic obsolescence for the MPP plant, and Defendant's M&E valuation for that facility is accepted.  Now, therefore,

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

statements stated RMVs of $1,552,820 and $17,507,040, respectively, for a total RMV of $19,059,860.  (Ptf's Ex 2 at 30, 35.)  Account 851309 therefore comprised approximately 8 percent of the total RMV and account 940711 comprised approximately 92 percent.  The court uses these percentages to allocate the plywood plant's value as of January 1, 2020, among those two tax accounts.

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted in part and denied in part. The RMV of the plywood and veneer plants as of January 1, 2020, and January 1, 2021, were $15.4 and $15.2 million respectively. The RMV of the MPP plant as of January 1, 2021, was $40,070,279.[13]

The breakdowns by plant, tax account, and valuation date are as follows:

| Plant | Account | Valuation Date | RMV |
|---|---|---|---|
| Veneer | 4610 | Jan 1, 2020 | $1,813,493 |
| Veneer | 4966 | Jan 1, 2020 | $49,551 |
| Veneer | 940705 | Jan 1, 2020 | $6,606,956 |
| | | **Total:** | **$8,470,000** |
| Plywood | 851309 | Jan 1, 2020 | $564,592 |
| Plywood | 940711 | Jan 1, 2020 | $6,365,408 |
| | | **Total:** | **$6,930,000** |
| Veneer | 4610 | Jan 1, 2021 | $1,822,472 |
| Veneer | 4966 | Jan 1, 2021 | $70,163 |
| Veneer | 940705 | Jan 1, 2021 | $6,467,365 |
| | | **Total:** | **$8,360,000** |
| Plywood | 851309 | Jan 1, 2021 | $731,321 |
| Plywood | 940711 | Jan 1, 2021 | $6,108,679 |
| | | **Total:** | **$6,840,000** |
| MPP | 6987 | Jan 1, 2021 | $14,000,000 |
| MPP | 944356 | Jan 1, 2021 | $26,070,279 |
| | | **Total:** | **$40,070,297** |

RICHARD D. DAVIS
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by __mailing__ to: 1163 State Street, Salem, OR 97301-2563; or by __hand delivery__ to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within __60__ days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

[13] This figure includes machinery and equipment value as determined by Defendant.

*This document was signed by Magistrate Richard D. Davis and entered on July 17, 2025.*